JOHN A. DECKER AND GLADYS I. DECKER, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 69496, 69497, 69498, 69499.   Filed May 12, 1959.

*K. V. Nicola, Esq.*, for the petitioners.
*Maurice B. Townsend, Jr., Esq.*, for the respondent.

DRENNEN, *Judge:* In these consolidated proceedings respondent determined deficiencies in income tax for the above petitioners for the taxable years and in the amounts shown below.

| Docket No. | Petitioners | 1953 | 1954 |
|---|---|---|---|
| 69496 | John A. Decker and Gladys I. Decker | $18,780.14 | $24,888.97 |
| 69497 | Estate of William E. Decker, deceased, Mary J. Decker, executrix, and Mary J. Decker | 15,049.44 | |
| 69498 | James W. Reichert and Barbara P. Reichert | 18,784.30 | 24,857.20 |
| 69499 | John F. Reichert III and Alice R. Reichert | 18,209.02 | 23,923.63 |

The issue is whether certain payments made by the Decker-Reichert Steel Company to each of the petitioners in the year 1953, and to each of the petitioners, except the petitioners in Docket No. 69497, in the year 1954, were distributions essentially equivalent to a dividend within the purview of section 115(g), I.R.C. 1939, and sections 301 and 302, I.R.C. 1954, respectively.

---

[1] Proceedings of the following petitioners are consolidated herewith : Estate of William E. Decker, Deceased, Mary J. Decker, Executrix, and Mary J. Decker, Docket No. 69497 ; James W. Reichert and Barbara P. Reichert, Docket No. 69498 ; John F. Reichert III and Alice R. Reichert, Docket No. 69499.

### FINDINGS OF FACT.

Some of the facts were stipulated and are found as stipulated.

Petitioners in each of the Docket Nos. except 69497 are husband and wife and filed joint income tax returns for the years 1953 and 1954 with the district director of internal revenue at Cleveland, Ohio.

William E. Decker died in November 1954. Mary J. Decker was his wife and is the executrix of his estate. William E. Decker and Mary J. Decker filed a joint income tax return for the year 1953 with the district director of internal revenue at Cleveland, Ohio. Petitioners in Docket No. 69497 are involved only in the year 1953.

The Decker-Reichert Steel Company, hereinafter referred to as Steel Company, was incorporated under the laws of Ohio in 1929, with its principal place of business in Cleveland, Ohio. Its authorized stock was 500 shares which was issued to and held 100 shares each by Arthur J. Decker, William E. Decker, John A. Decker, James W. Reichert, and John F. Reichert III, prior to and at the time of the death of Arthur J. Decker in July of 1953.

On January 14, 1939, the above five stockholders, being all the stockholders of Steel Company, entered into a stock purchase agreement wherein it was agreed that upon the death of one of the five stockholders, the surviving stockholders would purchase from his estate all of the deceased stockholder's stock in the company at book value within 90 days after his death. This agreement was amended from time to time in particulars not here pertinent and was in effect at the death of Arthur J. Decker in 1953. The agreement was also ratified and confirmed by the four surviving stockholders after the death of Arthur J. Decker and was in effect at the death of William E. Decker in November of 1954.

Following the death of Arthur J. Decker, a special meeting of the board of directors of Steel Company was held at which it was pointed out that under the terms of the stock purchase agreement the four surviving stockholders were required to purchase the 100 shares of stock of the company owned by Arthur J. Decker during his lifetime. The minutes of the meeting also contained the following:

Mr. Decker reported that the surviving shareholders were desirous of living up to the terms of their contract with the decedent, but that none of the shareholders were in a position to purchase said shares at the present time. He stated that in his opinion the matter was of importance to the corporation because the company's best interest required the continuity of the present management.

A discussion was had in which it was pointed out that the company had discussed for some time the possibility of including some of the company's key employees as shareholders and that it would appear that the death of Mr. Decker and the inability of the surviving shareholders to purchase and hold his shares, had placed the company in a position where it could obtain treasury shares which later could be sold to the key employees.

Whereupon, the following motion was made, seconded and unanimously adopted:

Moved: That The Decker-Reichert Steel Company purchase the 100 shares of stock owned by Arthur J. Decker during his lifetime at the price of $1198.56 per share, and that said shares be held by the corporation as Treasury Shares until further action of the Board of Directors.

Each of the four surviving stockholders, being William E. Decker, John A. Decker, John F. Reichert III, and James W. Reichert, purchased 25 shares of stock of Steel Company from the estate of Arthur J. Decker for its book value as of January 1, 1953, being $1,198.56 per share, and immediately resold these shares to Steel Company for the same price, all during the year 1953. The total amount paid by the company was $119,856, or $29,964 to each of the four stockholders.

Following the death of William E. Decker on November 22, 1954, a meeting of the board of directors of Steel Company was held on December 22, 1954, the minutes of which meeting contained the following:

John A. Decker, who had just returned from the hospital from an operation, and was not yet working full time, explained that the meeting had been called because of the death of William E. Decker in November, and the desire of the remaining stockholders to fulfill their obligations to his widow, Mary J. Decker. He reviewed that on December 20th the Company had loaned the three remaining stockholders the money to purchase William E. Decker's stock from his widow: that this money was to be repaid to the Company as soon as possible, as much as possible before December 31, 1954. There was much discussion on the best way to handle this transaction. The stockholders had, on the morning of December 22nd, paid Mary J. Decker in full for the stock, as per an agreement they had entered into in September, 1953, after the death of Arthur J. Decker. After some discussion, James W. Reichert moved that the Company buy the 100 shares of stock involved, and place it in the Treasury of the Company. He stated that he could not conveniently and quickly procure enough cash to buy 33⅓ shares without personal sacrifice, and he doubted the other stockholders could either. He thought this action would be best: it would positively prevent any of the stock from getting into unfriendly or competitive hands, that borrowing money with the stock as collateral often had unfortunate results. John F. Reichert III said he [did] not think the Company could afford the purchase. James W. Reichert said he thought we would have to afford it, even if it meant the Company would become a borrower to do it. John A. Decker seconded the original motion, which passed unanimously. John F. Reichert III suggested that, since the December 20th checks to loans to stockholders had not yet been posted, and since the company was acquiring the stock and placing it in the Company Treasury, he thought we could post those checks directly to the Surplus Account. Since no objections could be seen to this, it was so agreed.

Each of the three surviving stockholders, being John A. Decker, John F. Reichert III, and James W. Reichert, purchased 33⅓ shares of the stock of the company held by William E. Decker at the time of his death for the book value thereof at January 1, 1954, being $1,329.36 per share, and immediately resold these shares to Steel Company for the same price, all during the year 1954. The total amount

paid by the company was $132,936.03, or $44,312.01 to each of the three stockholders.

The 200 shares of stock originally held by Arthur J. Decker and William E. Decker and purchased by the company were held by the company as treasury stock. As of January 1955, the only other issued and outstanding stock of the company was the original 100 shares held by each of the three surviving stockholders.

Sometime after 1945, the stockholders and officers of the company began giving some consideration to selling stock of the company to some of the key employees. One or more of these employees discussed the matter with several of the officers of the company from time to time. They were told that for the present the management thought five stockholders were enough, but if any of the present stockholders died or if stock became available, further consideration would be given to selling stock to key employees to get some younger blood into the corporation. One of the employees mentioned the stock purchase to the officers of the company sometime after the death of Arthur J. Decker and was told that consideration would be given to the request, and if anything could be worked out, now was the logical time to do it.

On November 21, 1955, the articles of incorporation of Steel Company were amended to increase the authorized stock from 500 shares to 50,000 shares. Thereafter the stock was split 100 for 1. Subsequent to the stock split the company sold some of its new treasury stock to key employees of the company. In 1955, 5 employees bought a total of 1,100 shares for $12 per share. In 1956, the same 5 and 1 additional employee bought a total of 1,100 shares for $15 per share. In 1957, 5 of the same 6 and 1 additional employee bought a total of 1,200 shares at $17.50 per share. In 1958, the same 7 and 1 additional employee bought a total of 1,400 shares at $19 per share, making a total of 4,800 shares sold by the company to employees during the years 1955 through 1958. The price paid for the stock by the employees was less than book value in each instance.

The following table shows the gross sales, taxable income, income tax paid, and dividends paid by the company in each of the years 1948 through 1957:

| Year | Sales | Taxable income | Income tax paid | Dividends paid |
|---|---|---|---|---|
| 1948 | $2,659,263.30 | $353,329.09 | $134,265.05 | $125,000 |
| 1949 | 2,319,545.35 | 245,914.42 | 93,447.48 | 105,000 |
| 1950 | 2,847,646.61 | 278,557.13 | 117,974.33 | 100,000 |
| 1951 | 2,901,312.32 | 331,179.16 | 183,746.72 | 125,000 |
| 1952 | 2,915,481.63 | 320,807.11 | [1] 178,614.65 | 100,000 |
| 1953 | 2,775,515.62 | 180,874.83 | 88,554.91 | 40,000 |
| 1954 | 2,695,287.60 | 148,468.33 | 71,666.48 | 1,500 |
| 1955 | 3,293,752.64 | 279,421.54 | 139,799.20 | 69,700 |
| 1956 | 3,084,280.33 | [2] | 137,930.23 | 64,000 |
| 1957 | 2,821,080.15 | [2] | 107,219.96 | 57,175 |

[1] Includes tax rebate credit, actual cash paid $161,319.70.
[2] Not shown on joint exhibit.

The income tax returns of Steel Company for the calendar years 1953 and 1954, which were received in evidence as joint exhibits of the parties, indicate that as of January 1 and December 31, 1953, the company had earned surplus and undivided profits in excess of the amounts paid to petitioners for the stock of Arthur J. Decker in the year 1953; and that as of January 1 and December 31, 1954, the company had earned surplus and undivided profits in excess of the amounts paid to petitioners for the stock of William E. Decker in the year 1954.

The amounts paid to petitioners for the stock of Arthur J. Decker in the year 1953 and for the stock of William E. Decker in the year 1954 were not distributions essentially equivalent to a taxable dividend within the meaning of section 115(g), I.R.C. 1939, and section 302(b)(1), I.R.C. 1954.

OPINION.

These cases present the question, which has been before the courts many times, whether payments made by a corporation to its stockholders in cancellation or redemption of its stock are essentially equivalent to the distribution of a taxable dividend within the meaning of section 115(g)(1), I.R.C. 1939,[2] and sections 301 and 302, I.R.C. 1954.[3]

While the pertinent provisions of the 1939 Code and the 1954 Code are in somewhat different form, for our purpose the question is the same—whether the payments made in each year were essentially

---

[2] SEC. 115. DISTRIBUTIONS BY CORPORATIONS.

(g) REDEMPTION OF STOCK.—

(1) IN GENERAL.—If a corporation cancels or redeems its stock (whether or not such stock was issued as a stock dividend), at such time and in such manner as to make the distribution and cancellation or redemption in whole or in part essentially equivalent to the distribution of a taxable dividend, the amount so distributed in redemption or cancellation of the stock, to the extent that it represents a distribution of earnings or profits accumulated after February 28, 1913, shall be treated as a taxable dividend.

[3] SEC. 301. DISTRIBUTIONS OF PROPERTY.

(a) IN GENERAL.—Except as otherwise provided in this chapter, a distribution of property (as defined in section 317(a)) made by a corporation to a shareholder with respect to its stock shall be treated in the manner provided in subsection (c).

\*　　\*　　\*　　\*　　\*　　\*　　\*

(c) AMOUNT TAXABLE.—In the case of a distribution to which subsection (a) applies—

(1) AMOUNT CONSTITUTING DIVIDEND.—That portion of the distribution which is a dividend (as defined in section 316) shall be included in gross income.

SEC. 302. DISTRIBUTIONS IN REDEMPTION OF STOCK.

(a) GENERAL RULE.—If a corporation redeems its stock (within the meaning of section 317(b)), and if paragraph (1), (2), (3), or (4) of subsection (b) applies, such redemption shall be treated as a distribution in part or full payment in exchange for the stock.

(b) REDEMPTIONS TREATED AS EXCHANGES.—

(1) REDEMPTIONS NOT EQUIVALENT TO DIVIDENDS.—Subsection (a) shall apply if the redemption is not essentially equivalent to a dividend.

\*　　\*　　\*　　\*　　\*　　\*

(d) REDEMPTIONS TREATED AS DISTRIBUTIONS OF PROPERTY.—Except as otherwise provided in this subchapter, if a corporation redeems its stock (within the meaning of section 317(b)), and if subsection (a) of this section does not apply, such redemption shall be treated as a distribution of property to which section 301 applies.

equivalent to a dividend. In view of our ultimate finding of fact in this case, we do not have to decide whether stock acquired by a corporation from its stockholders and held as treasury stock is a redemption of the stock under the 1939 Code, upon which question there are differences in the two Codes.

It would serve no useful purpose to discuss the numerous cases that have considered this issue. It is recognized in the case law and in the regulations [4] that the question whether a distribution in redemption of stock is essentially equivalent to a dividend depends on the facts and circumstances of each case. The cases on this point, some of which are cited below in the footnote,[5] have established certain factual criteria or guideposts that should be considered, but it is clear that there is no magic formula or combination of these criteria that will give the conclusive answer in each case. Some of these factors are given more weight in some cases while others are considered more important in other cases. We have given consideration to these criteria and have made an effort to accord proper weight to each under the facts in this case. In doing so we have attempted to determine the net effect of the distribution, which is the fundamental question in administering this provision. *Flanagan* v. *Helvering*, 116 F. 2d 937 (C.A.D.C.), affirming a Memorandum Opinion of this Court dated December 27, 1938.

In applying these criteria to the facts in this case, we find that tax avoidance does not appear to have been a major consideration in having the corporation purchase this stock. The corporation had a good dividend record, having for a number of years paid out in dividends a large part of its earnings after taxes. The object of both the stockholders and the corporation was to prevent the stock of the company from falling into the hands of widows, minors, or outsiders and this was of benefit to the corporation as well as the stockholders. The corporation was also desirous of acquiring treasury stock that could be sold to key employees from time to time as the board of directors deemed it advisable. This objective was carried out as evidenced by the fact that the stock acquired by the corporation was not canceled and about 25 per cent of the original 200

---

[4] Sec. 1.302–2(b), Income Tax Regs.

[5] *Bazley* v. *Commissioner*, 331 U.S. 737; *Commissioner* v. *Estate of Bedford*, 325 U.S. 283; *Flanagan* v. *Helvering*, 116 F. 2d 937 (C.A.D.C.), affirming a Memorandum Opinion of this Court dated December 27, 1938; *Commissioner* v. *Snite*, 177 F. 2d 819 (C.A. 7), affirming 10 T.C. 523; *Kirschenbaum* v. *Commissioner*, 155 F. 2d 23 (C.A. 2), affirming a Memorandum Opinion of this Court dated March 27, 1945, certiorari denied 329 U.S. 726; *Wall* v. *United States*, 164 F. 2d 462 (C.A. 4); *Boyle* v. *Commissioner*, 187 F. 2d 557 (C.A. 3), affirming 14 T.C. 1382, certiorari denied 342 U.S. 817: *Ferro* v. *Commissioner*, 242 F. 2d 838 (C.A. 3), affirming T.C. Memo. 1956–94; *Holsey* v. *Commissioner*, 258 F. 2d 865 (C.A. 3), reversing 28 T.C. 962; *Zipp* v. *Commissioner*, 259 F. 2d 119 (C.A. 6), affirming per curiam 28 T.C. 314, certiorari denied 359 U.S. 934; *Bona Allen, Jr.*, 41 B.T.A. 206; *Samuel A. Upham*, 4 T.C. 1120; *Pullman, Inc.*, 8 T.C. 292.

shares acquired (increased to 20,000 as a result of the stock split) had been sold to employees within 3 or 4 years following the deaths of two of the older officers and stockholders. While it may be that the stockholders could have personally sold some of their stock to key employees to accomplish this objective, as suggested by respondent, this would have been awkward and difficult to handle without disrupting the balance of interest of the individual stockholders.

Both of the stock acquisitions here involved were accomplished by two steps—the surviving stockholders first buying the stock from the estate of the deceased stockholder and then immediately selling it to the company at the same price. So technically, the purchase of stock from the surviving stockholders did not result in any change in the percentage of ownership of the corporation. But it is evident that in each instance the plan was to have the company acquire the stock. So the net effect of the transactions when completed was that the company had bought the stock of the deceased stockholder, and the percentage of ownership of the surviving stockholders was increased from 20 to 25 per cent in one instance and from 25 to 33⅓ per cent in the second instance—if the shares held by the corporation in its treasury are ignored, which would be necessary if these payments were to be treated as dividends.

From the standpoint of the company, by adjusting its book entries this could be made to appear the same as the distribution of a dividend. This would require reducing the accumulated earnings and undivided profits by the amounts paid out for the stock and not entering the treasury stock as an asset. However, this would be somewhat unrealistic in view of the fact that the company has since realized over $75,000 from the sale of this stock to key employees. And, furthermore, the cash paid out by the corporation did not wind up in the hands of the stockholders to whom a dividend is sought to be charged, but in the estate of a deceased stockholder which simply sold the stock for that amount.

Petitioners did not receive any true economic benefit from the transactions when considered as a whole. They had the same amount of cash and the same number of shares of stock after the transactions were completed as they had before the death of the deceased stockholder. Their stock represented a higher percentage of equity in the basic assets of the company, but those basic assets were reduced proportionately so the stock actually represented the same values, assuming that the book value for which the stock was bought and sold represented the value of the underlying assets. So petitioners gained nothing from the distribution unless it is that the use of company funds to meet their obligations under the stock purchase agreement produced an economic benefit for them.

Respondent relies principally on this argument that corporate funds were used to satisfy the personal obligations of petitioners under the stock purchase agreements and, therefore, the payments were essentially equivalent to dividends, citing *Wall* v. *United States*, 164 F. 2d 462 (C.A. 4), and *Ferro* v. *Commissioner*, 242 F. 2d 838 (C.A. 3), affirming T.C. Memo 1956-94. In both of these cases, the taxpayer was the sole stockholder and had become so by previously incurring the obligation which corporate funds were used to satisfy. There was no corporate business purpose for the corporation to pay these obligations and the only ones benefiting therefrom were the stockholders, and the decision for the corporation to pay the obligation was made several years after the obligations were incurred by the taxpayers.

In our case, none of the petitioners ever had complete ownership or control of the corporation, and we believe there was a sound business reason for the corporation to acquire the stock. While petitioners may have been obligated to purchase the stock of a deceased stockholder, this is a different sort of obligation from those in the *Wall*, *Ferro*, and other cases wherein this point has been raised. Petitioners' obligation here was to purchase stock for its book value. Presumably, the stock was worth what was paid for it. Had petitioners bought and retained the stock, their net worths would have remained the same. The corporation did not pay a preexisting debt of the petitioners, the satisfaction of which would increase their net worths. They realized no economic benefit from the transaction. And here the resale to the corporation was obviously a part of a plan to buy the stock of the deceased stockholder in a manner that was best for all concerned.

If this payment is treated as a distribution essentially equivalent to a dividend, it would follow that petitioners paid out of their own funds $1,198.56 and $1,329.36 per share for stock which they then contributed to the corporation without consideration. This is not in accord with the realities of the situation. We think the facts in this case are more analogous to those in *Commissioner* v. *Snite*, 177 F. 2d 819 (C.A. 7), affirming 10 T.C. 523, than to those in any of the other cases cited. In the *Snite* case, as here, employees of the corporation took the initiative in seeking to obtain some of the stock of the company. While in *Snite* the employees may have applied more pressure with threats to resign etc., here there was a closer relationship between the stockholders and the employees which may have had something to do with it. The witness Radabaugh testified that the stockholders were friends of his and, while he spoke to them several times about acquiring stock, he did not want to be a pest about it. But in *Snite*, as in this case, the more satisfactory method of meeting these employee requests was for the corporation to sell them the stock.

Considering all the factors applicable to this case, and particularly those mentioned above which seem to us to be entitled to more weight than some others in this case, we do not think either transaction occurred at such time and in such manner as to be essentially equivalent to the distribution of a taxable dividend, and we so hold.

Because petitioners in Docket No. 69498 have conceded certain minor adjustments,

*Decisions will be entered under Rule 50.*