John McShain and Mary H. McShain, Husband and Wife v. Commissioner.
McShain v. Commissioner
Docket No. 90445.
United States Tax Court
T.C. Memo 1963-306; 1963 Tax Ct. Memo LEXIS 40; 22 T.C.M. (CCH) 1611; T.C.M. (RIA) 63306; November 18, 1963
Fred L. Rosenbloom, 1719 Packard Bldg., Philadelphia, Pa. and Thomas P. Glassmoyer, for the petitioners. Edward L. Newberger, for *41 the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: The respondent determined a deficiency in petitioners' income tax for the year 1956 in the amount of $70,063.15. The issue is whether a corporate distribution of $125,000 to John McShain in redemption of some of his stock was essentially equivalent to a dividend. Findings of Fact The petitioners are husband and wife, residing in Philadelphia, Pennsylvania. Their joint return for 1956 was filed with the district director of internal revenue for the district of Philadelphia, Pennsylvania. John McShain will hereinafter sometimes be referred to as petitioner. Atlantic City Transportation Company (hereinafter called "Atlantic") is a public utility of the State of New Jersey, incorporated on October 24, 1945. It provides local public transportation in Atlantic City, New Jersey and the neighboring communities of Ventnor City, Margate City, Longport and Ocean City. Upon incorporation, Atlantic's authorized capital stock consisted of: 4,120
shares of preferred stock with a par value
of $100 per share
25,000
shares of Class A common stock with a
par value of $10 per share
10,000
shares of Class B common stock without
par value
*42 All voting powers are vested exclusively in the common stock, both the Class A and Class B stock being entitled to one vote per share. No shares of preferred stock of Atlantic were outstanding during the years 1948 through 1956. Of the moneys available for dividends on the common stock, dividends may be paid, at the discretion of the board of directors, in the following manner: Non-cumulative dividends upon Class A common stock up to, but not exceeding, 5 percent per annum; thereafter, all dividends shall be upon Class B common stock. In the event of dissolution, the holders of the preferred stock are first entitled to payment in full of the face amount of such preferred stock; next the holders of the outstanding Class A common stock are to be paid in full the face amount of such Class A common stock; and the holders of the outstanding Class B common stock are entitled to the remainder of the assets. From the time of its organization in 1945 until September 9, 1954, Atlantic's common stock was held as follows: Class A Common Stock
Certificate No.
Name
No. of Shares
A1
John McShain, Inc.
12,500
A2
McCloskey Corporation
of Pa.
12,500
Total
25,000
B1
John McShain
4,500
B2
Matthew H. McCloskey,
Jr.
4,500
B3
Thomas H. Munyan
1,000
Total
10,000
*43 The total outstanding stock of John McShain, Inc., during the years here involved, consisted of 2,800 shares of common stock held as follows: John McShain
1,401 shares
Harry H. McShain
1,399 shares Hereafter the term "McShain stock" refers to the Class A stock owned by John McShain, Inc. and the Class B stock owned by John McShain. Matthew H. McCloskey, Jr. was the president and principal shareholder of McCloskey Corporation of Pa. Hereafter the term "McCloskey stock" refers to the Class A stock owned by McCloskey Corporation of Pa. and the Class B stock owned by Matthew H. McCloskey, Jr. Atlantic operated two divisions: the Atlantic City-Ocean City division and the Atlantic Avenue-Longport division. The Atlantic City-Ocean City division was converted from an electric railway to a bus operation in 1948. The Atlantic Avenue-Longport division, which served Atlantic City, Ventnor City, Margate City and Longport, operated trolley cars until the latter part of 1955 when it too was converted to a bus operation. Discussions and negotiations looking toward the conversion of the Atlantic Avenue-Longport division were begun about 1949 but were then suspended for several *44 years. Negotiations were renewed in 1953 and continued in 1954 and 1955. Atlantic owned substantial real estate in the four municipalities and also a right-of-way running from Rhode Island and Atlantic Avenues in Atlantic City to 15th Street and Atlantic Avenue in Longport. The right-of-way and a substantial amount of the real estate were not necessary for a bus operation, and Atlantic planned to dispose of those assets upon consummation of the conversion. Prior to August 1954, McCloskey and Munyan handled the negotiations with the municipalities with regard to the transfer of the right-of-way coincident with the conversion from trolley cars to buses. By August 1954, negotiations had reached the point where the conversion appeared imminent, and buses had been ordered by Atlantic. The conversion to a bus operation had to be effective before the right-of-way and the excess lands could be sold since the required consent of the New Jersey Public Utilities Commission to such sales could only be secured upon a certification that the property was no longer used or useful for transportation purposes. In the summer of 1954, Thomas H. Munyan, who was the owner of 10 percent of Atlantic's *45 Class B stock, and who, over the years, had acted as counsel for Atlantic, conceived the idea of using the proceeds from the sale of Atlantic's unneeded real estate to retire either the McCloskey stock or the McShain stock. Munyan was interested in promoting this plan since his interest in the Class B stock would thereby be approximately doubled. Munyan broached his proposal to both McCloskey and petitioner. Both were interested, and as a result a meeting of Atlantic's shareholders was held at McCloskey's apartment in Philadelphia, Pennsylvania, on August 11, 1954. Munyan's proposal contemplated a complete redemption by Atlantic of either the McCloskey stock or the McShain stock, and the shareholders' meeting of August 11, 1954 was devoted to developing a plan to consummate such redemption. Petitioner entered the shareholders' meeting of August 11, 1954 intending to sell the McShain stock provided the price offered him was satisfactory. However, petitioner insisted that McCloskey agree to sell the McCloskey stock at the same price if petitioner was not satisfied with the offered price. When he was informed of the price offered, petitioner was not satisfied with it, and as a result *46 McCloskey agreed to the redemption of all the McCloskey stock. At the conclusion of the shareholders' meeting of August 11, 1954 the following memorandum of agreement was signed by both McShain and McCloskey: MEMORANDUM OF AGREEMENT Understanding between the undersigned is as follows: McShain pays McCloskey $300,000 for preferred and common stockholdings of McCloskey in Atlantic City Transportation Co. to be paid as follows: By transfer of real estate not needed for company purposes (with exception of possible tract of car barn) to McCloskey at $150,000 with understanding when sold if property bring less difference will be made up to McCloskey if sold for more 1/2 of excess will be paid to McShain; $150,000 will be paid by 15 notes at $10,000 each due monthly starting September and falling due monthly thereafter with the exception the months December, January, February and March. Signed John McShain M. H. McCloskey On August 12, 1954, the day following the meeting at which McCloskey agreed to sell the McCloskey stock, petitioner, who for some months had been inactive in the operation of Atlantic, met with Atlantic's general manager and its auditor to review the condition *47 of the company and the status of the negotiations with the municipalities. At that meeting, petitioner was apprised of the company's poor financial condition and of the fact that the municipalities were not in agreement with regard to the terms and conditions under which the conversion and the transfer to them of the right-of-way were to be accomplished. As a result of his meeting with the general manager and the auditor, petitioner canceled all arrangements tentatively made with the municipalities and canceled the order for buses. Shortly thereafter McShain told Munyan he wanted him to sell out on the same basis as McCloskey, and Munyan agreed to this. There were further negotiations between the shareholders culminating in their execution of the contract of September 9, 1954. Under the agreement of September 9, 1954, no real estate was to be transferred to McCloskey but petitioner agreed to buy all of the Atlantic stock owned by McCloskey, McCloskey Corporation of Pa., and Munyan for $339,000, subject to an adjustment based upon the purchase price or valuation of certain real estate owned by the corporation and listed in a schedule attached to the agreement. The consideration *48 of $339,000 was represented by two series of promissory notes, bearing interest at the rate of 3 percent per annum, executed by petitioner and delivered to the sellers. With regard to the adjustment in the purchase price, based on the value of certainreal estate, the agreement of September 9, 1954, provided as follows: (1). To Wit: McShain will pay to McCloskey an amount equivalent to one-half (1/2) of the excess over $150,000.00 of the value of real estate owned by the Atlantic City Transportation Company, listed and described in Exhibit "A" attached hereto, and by this reference made a part hereof, which value shall be determined by either actual sales thereof or proposed sales, or valuation attributed thereto by a representative of the Real Estate Board of Atlantic City as provided herein, in accordance with the procedures as hereinafter set forth; and McShain will pay to Munyan an amount equivalent to tenforty-fifths (10/45ths) of one-half (1/2) of the excess over $150,000.00 of the value of real estate owned by Atlantic City Transportation Company, listed and described in Exhibit "A" attached hereto, and by this reference made a part hereof, which value shall be determined *49 by either actual sales thereof or proposed sales; or by a representative of the Real Estate Board of Atlantic City as provided herein, in accordance with the procedures as hereinafter set forth. In the event that such actual sales, proposed sales or valuation result in an overall valuation of the real estate listed in Exhibit "A" of less than $150,000.00, then McCloskey will credit McShain for an amount equivalent to one-half (1/2) of the deficiency between such valuation and $150,000.00 and Munyan will credit McShain for an amount equivalent to 10/45th of one-half (1/2) of such deficiency. In other clauses of the contract provision was made for using appraisal values of unsold real estate on July 11, 1956 for the purpose of computing the adjustments to the consideration provided above. The stock certificates for the shares of Class A and Class B stock sold by McCloskey Corporation of Pa., Matthew H. McCloskey, Jr. and Thomas H. Munyan under the agreement of September 9, 1954, were reissued in the name of John McShain. After September 9, 1954 the outstanding stock of Atlantic was registered as follows: Class A Common Stock
Certificate No. *
Name
No. of Shares
A1
John McShain, Inc.
12,500
A4
John McShain
12,500
Total
25,000
B1
John McShain
4,500
B4
John McShain
4,500
B5
John McShain
998
B6
Joseph W. Hamition
1
B7
Edward S. Barnhart
1
Total
10,000
*50 The agreement of September 9, 1954 was performed in accordance with its terms and the notes were paid as they fell due. During the period from January 12, 1955 to July 11, 1956, Atlantic sold some 10 parcels of real estate described in the agreement of September 9, 1954 for a total of $138,600. On July 17, 1956, an appraisal was made by the Atlantic City Real Estate Board of those parcels of real estate described in the agreement of September 9, 1954 which had not been sold by July 11, 1956. Pursuant to the provisions of paragraph (1) of such agreement, and on the basis of the above sales and the appraisal, payments of $49,906.60 and $11,090.35 were made by John McShain to Matthew H. McCloskey, Jr. and Thomas H. Munyan, respectively, as additional consideration for their stock. The checks in payment of principal and interest on the notes given in consideration for the purchase of the Atlantic stock were drawn on John McShain's personal bank account. At a meeting held March 22, 1956, the board of directors of Atlantic adopted appropriate resolutions (a) to amend the charter of the corporation to reduce its authorized capital stock to 12,500 *51 shares of Class A common and 10,000 shares of Class B common, and (b) to effectuate this reduction by purchasing at par value and canceling 12,500 shares of the Class A common then outstanding. These resolutions were approved by the shareholders on the same date. On March 28, 1956 Atlantic acquired Certificate No. A-4, representing 12,500 shares of Class A common stock from John McShain for $125,000. The stock was retired by the corporation. On March 28, 1956, Atlantic had earnings and profits in excess of $125,000. No dividends were paid on either the Class A common stock or the Class B common stock of Atlantic except for 2 1/2 percent dividend paid on the Class A common in 1946. Respondent's determination that petitioner realized taxable income in the amount of $125,000 upon the redemption of 12,500 shares of Class A common stock of Atlantic gives rise to the deficiency in question. The redemption of petitioner's stock by Atlantic in 1956 was not essentially equivalent to a dividend. Opinion The issue here is whether the distribution by Atlantic of $125,000 in redemption of Class A common stock was essentially equivalent to a dividend to petitioner. Section 302(a), Internal Revenue Code *52 of 1954, provides that a redemption of stock "shall be treated as a distribution in part or full payment in exchange for the stock" if it falls into any one of the four categories set forth in section 302(b). The first category which is set forth in section 302(b)(1) are those redemptions that are "not essentially equivalent to a dividend." It is respondent's position here that the March 28, 1956 redemption of petitioner's Class A common stock for $125,000 was essentially equivalent to a dividend. Whether or not a distribution in redemption of stock is essentially equivalent to a dividend is a question of fact which depends upon the facts and circumstances of each case. Isidore Himmel, 41 T.C. $1 , (Oct. 15, 1963); United States v. Carey, 289 F. 2d 531; and sec. 1.302-2(b), Income Tax Regs. Respondent's argument is that the distribution in liquidation of the Class A stock in 1956 served no apparent corporate business purpose and the net effect of such distribution was to distribute accumulated earnings to petitioner, who owned virtually all of the stock of the corporation.[1]
*53 Respondent's argument attaches no importance to the events leading up to the contract of September 9, 1954 including the facts relating to Atlantic's contemplated conversion from trolley cars to buses. Of course, if this case is viewed as simply a case where petitioner, who was the owner of virtually all of the stock in 1956 when he caused Atlantic (which had earnings in excess of $125,000) to redeom part of his stock for $125,000, dividend equivalence would be rather obvious. Petitioner argues that the admonition to look at and consider all of the facts and circumstances which is expressed in respondent's regulation, and has been so often expressed in the many cases involving the issue of dividend equivalence, means we must look at the facts before and after the contract between the shareholders of September 9, 1954. We feel petitioner is right. When we do this we find the starting point as the early summer of 1954 when petitioner and McCloskey each owned 45 percent of Atlantic and Munyan, the corporation's counsel, owned 10 percent of Atlantic's stock. In July of 1954 the conversion of Atlantic from a trolley car operation on its Atlantic Avenue-Longport division, to a bus operation *54 over the same route was imminent. It is well established that such conversion would mean a substantial amount of real estate that Atlantic owned and used for car barns, storage yards, terminals, turn-arounds, and right-of-way, would no longer be necessary for bus operation. It is also quite well established that the early negotiations between the shareholders contemplated the immediate redemption of the stock of one of the major stockholders to be accomplished by the corporation's transfer of part of the unneeded realty and the payment of money to the retiring shareholder. This is shown by the fact that the original plan, which was Munyan's plan that was discussed at the August 11, 1954 meeting, culminated in the hurriedly executed memorandum of agreement whereby unneeded corporation-owned realty was to be transferred to him in part payment for his stock. There is also in evidence a letter McCloskey wrote to Munyan on August 12, 1954 which contained a more detailed description of the tentative agreement. This letter, which directed Munyan to draft the formal contract, indicates that the notes McCloskey was to take in payment for his stock were to be made out by Atlantic. Munyan testified *55 that the immediate distribution by transfer or sale of disposable property in liquidation of one major shareholder's stock interest was proposed by him because this would double his stock interest - a goal not obtainable if one major shareholder merely sold out to the other. Both petitioner and McCloskey testified that the agreement of August 11, 1954 was that the corporation would redeem McCloskey's stock. It was not until sometime after the August 11, 1954 agreement when further negotiations were had that the original understanding reached on August 11, 1954 was changed. In the days that followed this first meeting it became obvious to all, and especially petitioner, that there would be delay in making the conversion to buses which would mean delay in getting disposable title to the realty that was to be utilized in redemption of McCloskey stock. The new agreement of September 9, 1954, which was reached as a result of further negotiations, provided petitioner would purchase McCloskey's stock and also Munyan's 10 percent stock interest. Munyan was included because petitioner had notified him that he would like him to sell out on the same basis as McCloskey and Munyan testified *56 he did not want to remain in the corporation if petitioner did not want him. Actually this agreement carried the same price adjustment contained in the earlier agreement with respect to gearing the ultimate purchase price of the stock to what the sale of the unneeded land would bring. It fairly appears that the shareholders at all times considered the land sales as the source from which payments for the McCloskey and Munyan stock would be obtained. Munyan testified: So McCloskey, McShain, and I met and it was agreed that the same basis of payment would be arrived at. And as far as I was concerned, I always considered it was a purchase by the company, but McShain lent his name and signed the agreement and the agreement carries the same formula that payment would be made and if the lands brought more money, we would get more money and if it would ultimately develop that the lands did bring more money, then we got more money. Petitioner testified to the same effect, saying that in all of the negotiations it was always understood that the corporation would be the real purchaser of the stock and that he merely acquired the stock to hold it until the conversion to buses could be accomplished *57 and the land made available, so that it could be sold and the stock redeemed from him when, by disposal of unneeded assets, the corporation would have capital in excess of that required for bus operation. [2] The record shows that the financing of buses could be accomplished by a 10 percent down payment and a chattel mortgage to a bank or lending agency. When consideration is given to all of the foregoing facts the resemblance of the 1956 redemption to a dividend seems to disappear. The fact that petitioner was personally obligated on the contract of September 9, 1954 and took ownership of the stock is not fatal to his position. John A. Decker, 32 T.C. 326, affd. per curiam, 286 F. 2d 427. What appears from a view of all of the facts is a contemplated change in the corporate operation and a planned termination *58 of the stock interest of at first one and later two of the three stockholders in Atlantic. The plan started out as a redemption retirement of one major stockholder by the corporation redeeming his stock and it ended up by including a minor stockholder and an interim purchase of the stock of both by the remaining stockholder, and subsequent redemption of part of the acquired stock. This merely means there was some variance in carrying out the general plan, which was of no significance to the corporation or petitioner or the retiring stockholders. The complete operation of the plan encompassed a radical change in the proportionate holdings of the three stockholders. Two would be retired and petitioner would emerge as the owner of the entire stock interest in a corporation whose assets would be diminished by the amount paid for the stock interest of the retiring stockholders. There was no practical difference to petitioner between a corporate redemption of the shares of the retiring shareholders or a purchase by him of the stock of the retiring stockholders followed by a redemption from him of some of the shares purchased at the price he paid for them. We have not undertaken to analyze *59 or discuss the many opinions applying tests and criteria in dividend-equivalency cases. Many of them are cited in John A. Decker, supra, and Isidore Himmel, supra. An analysis of the many cases in this area serves only to point up the principal that there is no single or conclusive test to apply. Quite obviously a pro rata redemption of stock amongst shareholders bears a resemblance to a dividend. Conversely, a non-pro rata redemption would not ordinarily resemble a dividend.[3] As stated earlier, if this case is viewed as respondent views it, i.e., the stock ownership on the day of redemption, it was proportionate for petitioner was virtually the only stockholder. If it is viewed from the beginning of the plan, as we think it should be, then there was a non-pro rata redemption. In John A. Decker, supra, surviving stockholders purchased the shares of deceased stockholders and transferred them to the corporation at the same price where they were held as treasury stock and some thereafter were sold to key employees. In holding the payments made to the surviving stockholders for deceased stockholders' stock were not essentially equivalent to dividends, we *60 held the fundamental question was "the net effect of the distribution." The net effect test was held to be "an important consideration in determining dividend equivalency" in United States v. Carey, supra. In the last cited case, taxpayer and Brown each held 50 percent of the stock. There was a pro rata redemption by the corporation of 145 shares (out of 300) of each stockholder. This would appear to resemble dividend equivalency but when it appeared this was only one step in a plan that would result in the retirement of the stock interest of Brown and the acquisition of almost all of that interest by a valued employee the Court concluded the redemption of taxpayer's stock was not essentially equivalent to a dividend. We hold, considering the transaction as a whole, that the redemption of petitioner's stock was not essentially equivalent to a dividend. The record indicates there were other adjustments conceded or not contested, so Decision will be entered under Rule 50. Footnotes
*. (Certificate A3 was voided).↩
1. Petitioner does not contest the constructive ownership feature of this case, i.e., constructively through his and his wife's stock ownership in John McShain, Inc. he owned virtually all of the stock of Atlantic.↩
2. The actual conversion took place in December of 1955. The record shows that by March of 1956 Atlantic had realized $438,000 from the disposition of its right-of-way and $138,600 from the sale of other unneeded land. Subsequently an additional $150,000 was received from the scrapping of some trolley cars, rails, poles, wire, and similar items.↩
3. Section 302(b)(2)↩ provides a substantially disproportionate redemption, with some limitations, and as therein defined, is to be treated as a sale.