WILLIAM K. EDMISTER AND ELIZABETH EDMISTER, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 747–65. Filed August 22, 1966.

*Robert H. Albert*, for the petitioners.
*John H. Menzel*, for the respondent.

DRENNEN, *Judge:* Respondent determined a deficiency in petitioners' income tax for the year 1961 in the amount of $18,056.58. The only issue remaining for decision is whether property received by petitioners in 1961 was a distribution essentially equivalent to a dividend.

### FINDINGS OF FACT

Some of the facts have been stipulated, and are found accordingly.

Petitioners William K. Edmister (hereinafter referred to as William) and Elizabeth Edmister (hereinafter referred to as Elizabeth) were husband and wife at all times during 1961, and they filed a joint Federal income tax return for the year 1961 with the district director of internal revenue, Cincinnati, Ohio.

The Capital Elevator & Manufacturing Co. (hereinafter referred to as Capital) is an Ohio corporation which was incorporated June 20, 1920, and since that time has been engaged in the business of manufacturing passenger and freight elevators. Prior to 1936 Capital operated under the name of the Capital Lift & Manufacturing Co. From March 17, 1959, to October 23, 1961, the outstanding stock of said corporation was owned by the following named individuals:

|  | Number of shares owned by each stockholder | Percent total shares owned by stockholders |
|---|---|---|
| Guy R. Blackwood | 378 | 28 |
| William K. Edmister | 513 | |
| Elizabeth Edmister | 18 | |
|    Total shares owned by the petitioners, William K. and Elizabeth Edmister | 531 | 39.3 |
| Dorothy B. Edmister | 76½ | |
| Dorothy B. Edmister, guardian of Nancy Ann Edmister | 121½ | |
| Dorothy B. Edmister, guardian of James Z. Edmister | 121½ | |
| Dorothy B. Edmister, guardian of Jane D. Edmister | 121½ | |
|    Total shares owned by Dorothy B. Edmister, individually and as guardian | 441 | 32.7 |
|    Total shares issued and outstanding | 1,350 | 100 |

Capital had only one class of stock outstanding during its existence, namely, common stock having a par value of $100 per share. All of the shares of this corporation had voting rights and there were no preferences between shares. Voting control of this corporation could be effected on all issues by a simple majority of all issued and outstanding shares of this corporation.

During the 20 years preceding 1961, all the shares of Capital were owned by William R. Edmister, father of William, by lineal descendants of William R. Edmister and their spouses, and by Guy R. Blackwood (hereinafter referred to as Blackwood).

Immediately prior to October 23, 1961, Blackwood was president and William was secretary and treasurer of Capital. Both of these men

were active participants in the operation and management of Capital. Immediately prior to October 23, 1961, the board of directors of Capital consisted of Blackwood, William, and Edmund M. Kagay, attorney for the corporation.

Dorothy B. Edmister (hereinafter referred to as Dorothy) is the widow of James Edmister, deceased brother of William. Nancy Ann Edmister, James Z. Edmister, and Jane D. Edmister are the three minor children born of the marriage between Dorothy and James Edmister. Dorothy and her three minor children were not, at any time, active in the operation or management of Capital, although immediately prior to October 23, 1961, Dorothy was vice president of the corporation. At all times during 1961, Dorothy was the duly appointed and acting guardian of her three minor children, having been appointed guardian by the Probate Court of Stevens County, Minn. At all times during 1961, and for several years immediately preceding 1961, Dorothy and her three minor children resided at Morris, Minn. The interests of Dorothy and her minor children will hereinafter be referred to collectively as Dorothy's interest.

The balance sheet of Capital as of December 31, 1960, indicates the following financial condition of the corporation at that time:

### ASSETS

| | | |
|---|---:|---:|
| *Current assets* | | |
| Cash | | $6, 227. 03 |
| Savings fund | | 45, 000. 00 |
| Accounts receivable— | | |
| Trade | $65, 222. 19 | |
| Officers and employees | 328. 54 | |
| Others | 3, 528. 31 | 69, 079. 04 |
| Interest receivable | | 262. 50 |
| Inventory of materials—at lower of cost or market | | 59, 053. 27 |
| Prepayments— | | |
| General insurance | 1, 751. 50 | |
| Group insurance | 54. 54 | |
| Subscriptions | 341. 25 | |
| Life insurance | 279. 67 | |
| Sales tax stamps | 62. 50 | |
| Dues and memberships | 179. 17 | 2, 668. 63 |
| Total current assets | | 182, 290. 47 |

| Property, plant, and equipment | Cost | Accumulated depreciation | Net | |
|---|---|---|---|---|
| Buildings | $24, 410. 46 | $14, 555. 45 | $9, 855. 01 | |
| Machinery and equipment | 13, 377. 20 | 11, 720. 33 | 1, 656. 87 | |
| Tools | 2, 049. 12 | 668. 17 | 1, 380. 95 | |
| Office furniture and fixtures | 5, 247. 19 | 2, 981. 95 | 2, 265. 24 | |
| Patterns | 334. 09 | 137. 70 | 196. 39 | |
| Auto equipment | 4, 969. 32 | 2, 965. 21 | 2, 004. 11 | |
| | 50, 387. 38 | 33, 028. 81 | 17, 358. 57 | |
| Land | | | 4, 433. 32 | $21, 791. 89 |

*Other assets*

| | | |
|---|---|---|
| Industrial insurance deposit | 3, 300. 00 | |
| Cash value life insurance | 6, 961. 62 | |
| Traveling advances | 165. 00 | |
| Deposits on plans | 80. 00 | 10, 506. 62 |
| Deferred charges | | 193. 84 |
| | | 214, 782. 82 |

## LIABILITIES

*Current liabilities*

| | | |
|---|---|---|
| Accounts payable | | $10, 243. 46 |
| Accruals— | | |
| Withholding tax | $3, 197. 36 | |
| State unemployment tax | 10. 75 | |
| Social security tax | 405. 80 | |
| Federal unemployment tax | 387. 82 | |
| Payroll | 2, 521. 18 | |
| City income tax—employees | 529. 79 | |
| Welfare fund expenses | 139. 87 | |
| Workmen's compensation | 2, 253. 78 | |
| State sales and use taxes | 591. 13 | |
| Payroll savings | 116. 36 | |
| Real estate taxes | 432. 37 | |
| Other expenses | 492. 10 | 11, 078. 31 |
| Total current liabilities | | 21, 321. 77 |
| Reserve for replacement of fixed assets | | 3, 107. 21 |
| Shareholders' investment: | | |
| Common capital stock issued and outstanding 1,350 shares | 135, 000. 00 | |
| Earned surplus, accumulated undivided profits | 55, 353. 84 | 190, 353. 84 |
| | | 214, 782. 82 |

The balance sheet of Capital as of December 31, 1961, indicates the following financial condition of the corporation at that time:

### ASSETS

*Current assets*

| | | |
|---|---:|---:|
| Cash | | $2,037.95 |
| Certificates of deposit | | 45,000.00 |
| Accounts receivable— | | |
| Trade | $103,826.01 | |
| Officers and employees | 204.59 | 104,030.60 |
| Interest receivable | | 300.00 |
| Inventory—at lower of cost or market | | 69,467.61 |
| Prepayments | | 4,454.23 |
| Total current assets | | 225,290.39 |

| Equipment | Cost | Accumulated depreciation | Net | |
|---|---:|---:|---:|---:|
| Machinery and equipment | $13,419.34 | $11,735.95 | $1,683.39 | |
| Tools | 2,101.89 | 735.91 | 1,365.98 | |
| Furniture and fixtures | 5,607.19 | 3,551.18 | 2,056.01 | |
| Patterns | 803.00 | 175.01 | 627.99 | |
| Auto equipment | 4,969.32 | 3,686.89 | 1,282.43 | |
| | 26,900.74 | 19,884.94 | | 7,015.80 |

*Other assets*

| | | |
|---|---:|---:|
| Cash value—life insurance | 7,235.54 | |
| Deposits | 3,375.00 | |
| Traveling advances | 265.00 | 10,875.54 |
| Deferred charges | | 87.79 |
| | | 243,269.52 |

### LIABILITIES

*Current liabilities*

| | | |
|---|---:|---:|
| Note payable | | $60,000.00 |
| Accounts payable | | 15,092.01 |
| Accruals— | | |
| Withholding taxes | $3,468.17 | |
| Payroll taxes | 3,583.30 | |
| Real estate taxes | 495.49 | |
| Payroll | 3,024.13 | |
| State sales and use taxes | 788.33 | |
| Payroll savings | 53.94 | |
| Welfare fund expenses | 185.85 | |
| Other expenses | 1,087.67 | 12,686.88 |
| Total current liabilities | | 87,778.89 |

*Shareholders' investment*

Capital stock—

| | | |
|---|---|---|
| Common—par value, $100; authorized, 1,500 shares; issued, 1,350 shares | $135, 000. 00 | |
| Less: 513 shares in treasury, at par value | 51, 300. 00 | |
| Outstanding, 837 shares | $83, 700. 00 | |
| Capital surplus | 37, 675. 77 | |
| Retained earnings | 67, 055. 37 | |
| Shareholders' undistributed taxable income | [1] 32, 940. 51 | $155, 490. 63 |
| | | 243, 269. 52 |

[1] Denotes red figure.

Blackwood was 72 years of age in 1961 and because of his age and state of health he wished to retire and dispose of his interest in Capital. Persons not associated with Capital offered Blackwood a price of $110 per share for his stock of the corporation on the condition that they could acquire a controlling interest. Blackwood discussed this offer with William and Kagay.

William was 50 years of age in 1961. He wished to remain an active participant in the operation of Capital but felt that it would have been improbable that he could have remained with the corporation if control was obtained by outside interests. Immediately prior to October 23, 1961, petitioners were financially unable to purchase all of the shares of Capital then owned by Blackwood and Dorothy at a price of $110 per share; and Blackwood and Dorothy were unwilling to sell petitioners only a portion of the Capital stock owned by them.

Dorothy, acting as guardian for her three minor children, obtained an order from the Probate Court of Stevens County, Minn., on September 26, 1961, ordering her to sell the shares of Capital owned by her three minor children.

A special meeting of the board of directors of Capital was held on October 5, 1961. The president and secretary of Capital were authorized to execute a deed transferring the real estate then owned by the corporation, upon which its plant was located, at 424 West Town Street, Columbus, Ohio (hereinafter referred to as the Town Street property), from the corporation to petitioners in exchange for the surrender by William to Capital of all of the corporation's stock then owned by him, consisting of 513 shares. The stockholders of Capital executed written consents authorizing and consenting to the foregoing exchange.

On October 23, 1961, at a closing held in the office of the attorney representing the City National Bank & Trust Co. of Columbus, Ohio

(hereinafter referred to as the bank), the following transactions were completed:

(a) William surrendered all his shares of stock of Capital to the corporation and in exchange petitioners received title to the Town Street property;

(b) Petitioners closed a mortgage loan with the bank as mortgagee, in the amount of $45,000. This mortgage was placed on the Town Street property, as well as on the personal residence of petitioners located at 832 Montrose Avenue, Columbus, Ohio;

(c) Petitioners leased the Town Street property to Capital and executed an assignment of the rent payable under the lease to the bank as additional security for the mortgage loan. The Town Street property lease provided for a net rental of $500 per month, the same amount as the payments required of petitioners under the terms of the mortgage loan agreement. Under the terms of the mortgage loan agreement, the last payment was due on October 23, 1971;

(d) Petitioners advanced $3,723.85 of their own funds and together with the $45,000 proceeds from the mortgage loan purchased the 441 shares of Capital then owned by Dorothy, which was all of the stock of the corporation then owned by Dorothy and the children; and

(e) An agreement was entered into between the bank, Capital, and the stockholders of Capital which restricted the issuance of additional shares of stock of Capital without the consent of the bank.

On October 23, 1961, a new stock certificate was issued in the name of William for the 441 shares of Capital previously owned by Dorothy. The bank received this reissued certificate as additional security for the $45,000 mortgage loan made by the bank to petitioners.

The bank acted as escrow agent for the sale of Dorothy's stock. The bank received these shares prior to October 23, 1961, by registered mail, with instructions to deliver the stock to William upon the bank's collecting the $48,510 [1] purchase price for Dorothy. Checks drawn on the bank totaling this amount were delivered to Dorothy following the closing.

On or before October 23, 1961, all of the stock of Capital owned by Blackwood, consisting of 378 shares, was placed in escrow with the bank subject to a purchase agreement whereby the corporation would purchase this stock for cash on January 2, 1962, at a price of $110 per share, for a total consideration of $41,580.

After the closing of the transactions on October 23, 1961, the deed, mortgage, lease, and assignment of rents executed, delivered, or received at the closing were filed by the attorney representing the bank with the Recorder of Franklin County, Ohio. The deed conveying the Town Street property, and the mortgage placed upon that prop-

---

[1] The $213.85 difference between the purchase price of the stock and the funds advanced by petitioners was used for payment of the mortgage expenses.

erty by petitioners to the bank were filed for record on October 24, 1961, with the Recorder of Franklin County, Ohio, and were recorded on October 26, 1961.

On January 2, 1962, after all of the arranged transactions had been consummated, ownership of the outstanding shares of Capital was as follows:

|  | Number of shares |
|---|---|
| William K. Edmister | 440 |
| Elizabeth Edmister | 18 |
| Edmund M. Kagay | [2] 1 |

As of October 23, 1961, the Town Street property had a fair market value of $46,500, and as of that date the 513 shares of stock of Capital belonging to William and surrendered by him to the corporation had a tax basis to him of $36,500.34.

The corporation continued its usual business after October 23, 1961. William's salary from Capital did not change during the period from 1961 to the time of trial, and in 1961 petitioner had no plans to liquidate the corporation. Immediately prior to October 23, 1961, the petitioners' net worth was approximately $27,500 exclusive of the stock of Capital which they owned.

The sole purpose of the transactions entered into between all the parties was to enable Blackwood and Dorothy to dispose of their stock in Capital in such a manner as to enable William to acquire control of the corporation. The business activities of Capital continued without significant changes after the transactions were completed. No changes in any of the business activities of Capital were planned or contemplated either prior or subsequent to the acquisition of control of the corporation by William.

Petitioners reported the transaction under Schedule D of their Federal income tax return for 1961 as the sale or exchange of a capital asset. They reported the value of the Town Street property ($46,500) as the sales price of the 513 shares of stock, claimed a basis of $47,981.18,[3] and claimed a capital loss of $1,481.18 on the transaction. Petitioners also claimed a loss of $7,252.24 on their return for 1961 as their distributive share of the 1961 loss of Capital, which had elected in 1958 to be taxed as a small business corporation under subchapter S of the Code. The amount of earned surplus of Capital available for distribution as dividends for the year 1961 was in excess of $46,500.

---

[2] This share is owned by William and was placed in the name of Edmund M. Kagay to qualify him as a director.

[3] Petitioners concede on brief that their basis in the stock was only $36,500.34 and that they actually realized a gain on the transaction.

In the notice of deficiency issued to petitioners respondent determined that "the real estate distributed to you by the Capital Elevator and Manufacturing Company and valued at $46,500.00 constitutes a dividend as defined by section 316 of the Internal Revenue Code and is includible in your income under section 61 of the Internal Revenue Code."

### ULTIMATE FACT

The distribution of the Town Street property to William by Capital in exchange for William's stock in Capital was essentially equivalent to a dividend.

### OPINION

The only issue for decision is whether the real estate transferred to William by Capital in exchange for his stock constituted a taxable dividend in 1961. Respondent contends that the transfer was a distribution essentially equivalent to a dividend and that the stipulated value of the real estate, $46,500, is taxable to petitioners as a dividend. Petitioners contend that the substance of the overall plan and what took place was the redemption of Blackwood's and Dorothy's stock by the corporation, with William acting as a conduit of funds from the corporation to Dorothy, and that the distribution of the real estate to William was only one step in the entire transaction and was not a dividend to William.[4]

The details of the transactions are set forth in our Findings of Fact and will not be repeated here. In summary, William surrendered all of his stock in Capital, 513 shares (which together with Elizabeth's 18 shares comprised 39.3 percent of the total outstanding stock of Capital), to Capital in exchange for the Town Street property. The property was then mortgaged by petitioners and the proceeds (plus additional cash furnished by petitioners) were paid to Dorothy and her minor children in exchange for all of their stock in Capital (441 shares or 32.7 percent) at $110 per share. Capital then redeemed all of Blackwood's shares (378 shares or 28 percent) for cash at $110 per share. When all the transactions were completed, petitioners owned the legal title to the Town Street property and all of the outstanding stock of Capital, the net worth of which had been decreased by the Town Street property conveyed to petitioners and the cash paid to Blackwood. The Town Street property, which was then encumbered with a $45,000 mortgage, was leased by petitioners to Capital and the rental was applied to the payments on the mortgage.

---

[4] We note that Dorothy's stock was not actually redeemed.

Under section 301 (a) and (c), I.R.C. 1954,[5] a distribution from the corporation is includable in the shareholder's gross income to the extent that it is a "dividend" as defined in section 316.[6] However, section 302(a)[7] provides generally that if any paragraph of section 302(b) applies a redemption of stock shall be treated as a distribution in part or in full payment in exchange for the stock. Petitioners seek to bring themselves within the ambit of this Code provision by contending that the distribution of the Town Street property was "not essentially equivalent to a dividend," and therefore section 302(b)(1)[8] applies. That section provides generally that section 302(a) shall apply if the redemption is not essentially equivalent to a dividend. Respondent argues that the distribution was equivalent to a dividend, therefore section 302(a) does not apply, and consequently the distribution is taxable as ordinary income under section 302(d),[9] which section provides generally that if a corporation redeems its stock, and if section 302(a) does not apply, then such redemption shall be covered by section 301 and included in gross income as a dividend. Neither of the parties argues that any other provisions of the Code are applicable and they agree that the crucial question is whether the distribution was essentially equivalent to a dividend within the meaning of section 302(b)(1).

Several reasons are advanced by petitioners in support of their argument that the distribution was not essentially equivalent to a dividend. In essence, their contentions are (1) the transactions were prompted by non-tax-avoidance reasons, (2) they received no financial benefit from the transactions, and (3) they did not secure a benefit they could not have enjoyed by using another method. Respondent

---

[5] All section references are to the Internal Revenue Code of 1954 unless otherwise indicated.
SEC. 301. DISTRIBUTIONS OF PROPERTY.
(a) IN GENERAL.—Except as otherwise provided in this chapter, a distribution of property (as defined in section 317(a)) made by a corporation to a shareholder with respect to its stock shall be treated in the manner provided in subsection (c).

    *        *        *        *        *        *        *

(c) AMOUNT TAXABLE.—In the case of a distribution to which subsection (a) applies—
(1) Amount constituting dividend.—That portion of the distribution which is a dividend (as defined in section 316) shall be included in gross income.
[6] SEC. 316. DIVIDEND DEFINED.
(a) GENERAL RULE.—For purposes of this subtitle, the term "dividend" means any distribution of property made by a corporation to its shareholders—
(1) out of its earnings and profits accumulated after February 28, 1913, * * *
[7] SEC. 302(a). GENERAL RULE.—If a corporation redeems its stock (within the meaning of section 317(b)), and if paragraph (1), (2), (3), or (4) of subsection (b) applies, such redemption shall be treated as a distribution in part or full payment in exchange for the stock.
[8] SEC. 302(b)(1). REDEMPTIONS NOT EQUIVALENT TO DIVIDENDS.—Subsection (a) shall apply if the redemption is not essentially equivalent to a dividend.
[9] SEC. 302(d). REDEMPTIONS TREATED AS DISTRIBUTIONS OF PROPERTY.—Except as otherwise provided in this subchapter, if a corporation redeems its stock (within the meaning of section 317(b)), and if subsection (a) of this section does not apply, such redemption shall be treated as a distribution of property to which section 301 applies.

argues that the several criteria developed by the courts in determining whether a particular distribution is essentially equivalent to a dividend are present in this case. These criteria, as enumerated in *Thomas Kerr*, 38 T.C. 723, affd. 326 F. 2d 225; *Flanagan v. Helvering*, 116 F. 2d 937, and several other cases, may be summarized generally as follows: (1) Was a plan adopted by the corporation for contraction of business activity, (2) did a contraction of corporate business actually occur, (3) was the plan initiated by the corporation or the shareholders, (4) was there a significant change in the proportionate ownership of stock, (5) the previous dividend history of the corporation, (6) whether earned surplus is adequate to cover the distribution, and (7) whether there is a bona fide corporate business purpose for the distribution. *Thomas Kerr, supra; Flanagan v. Helvering, supra*. While it is clear that this plan was initiated by the stockholders for their own purposes and that there was no intended contraction of the corporate business nor was any other business purpose of the corporation served by the distribution, we do not believe those factors are necessarily controlling here because the question of whether a distribution is essentially equivalent to a dividend is a question of fact to be determined from all the circumstances involved in each particular case. *Heman v. Commissioner*, 283 F. 2d 227, affirming and modifying on other grounds 32 T.C. 479; *Lowenthal v. Commissioner*, 169 F. 2d 694, affirming a Memorandum Opinion of this Court. Nevertheless, after carefully considering all of the facts present, in this instance we are of the opinion that the distribution of the Town Street property to petitioners was essentially equivalent to a dividend.

We agree with petitioners that all the steps involved in the entire plan must be considered and the substance of the entire transaction must be ascertained. *Fox v. Harrison*, 145 F. 2d 521; *Erickson v. United States*, 189 F. Supp. 521. The form of the transaction is not necessarily controlling and the essential question for determination is the net effect of the distribution. *John A. Decker*, 32 T.C. 326, affd. 286 F. 2d 427 (C.A. 6); *Flanagan v. Helvering, supra*.

We have no reason to doubt from the evidence that the principal purpose of the overall plan was to permit Blackwood and Dorothy to dispose of their stock in Capital at a price of $110 per share in such a manner as to enable William to acquire control of the corporation. The fact that this was primarily for the benefit of the stockholders rather than the corporation is not fatal, see *Erickson v. United States, supra*, although it is a factor to be taken into consideration, *Thomas Kerr, supra*. There is no direct evidence that the plan adopted to achieve this objective was adopted for tax-avoidance purposes (although there is little satisfactory evidence to indicate why

Capital itself did not borrow the money on the real estate to buy out Dorothy). Nevertheless, we believe that when the plan was completed petitioners had received substantive benefits which made the distribution essentially equivalent to a dividend. This being the case we do not think petitioners can avoid the resulting tax by arguing that the same result could have been achieved tax free under some other plan, whether or not this is correct.

Prior to the transaction petitioners together owned stock representing 39.3-percent ownership of a corporation having a net book value of about $190,000, the book value of their interest being about $74,670 or $141 per share. Immediately after William had surrendered his stock in exchange for the real estate (which had a book value on Capital's books of $14,288.33) and had acquired Dorothy's stock, and assuming no other changes in the corporate balance sheet, petitioners together owned 459 out of 837 shares outstanding, or about 55 percent of a corporation having a net book worth of about $176,000. This interest represented a book value of about $96,800. Carrying this one step further, after the corporation redeemed Blackwood's 378 shares for $110 per share in cash, and again assuming no other changes in the corporate balance sheet except elimination of this cash and the real estate, petitioners owned 100 percent of a corporation having a net book worth of about $134,400. These facts alone make this case distinguishable from such cases as *John A. Decker, supra; Fox* v. *Harrison, supra; Hargleroad* v. *United States*, 202 F. Supp. 92.

But in addition to the above-demonstrated increase in the book value of petitioners' interest in Capital, they also acquired legal title to the Town Street property. It is true that in order to carry out the transaction with Dorothy petitioners had to mortgage this property, having a fair market value of $46,500, for $45,000, and also had to include their residence under the mortgage and pay out $3,723.85 of their own funds. But the Town Street property was immediately leased to Capital for $500 rent per month which was the amount of the payments petitioners were required to make on the mortgage to pay it off in 10 years. Thus each payment of $500 by Capital increased petitioners' equity in the real estate. We recognize that these payments were taxable to petitioners as rent, as would dividend payments have been, but the payments were presumably deductible by Capital as rent, whereas either direct payments of principal by Capital on its own loan or distributions to petitioners of dividends, would not be deductible by Capital.

Petitioners argue that they received no financial benefit from the transactions because they surrendered stock having a value of $56,430 (at $110 per share) in exchange for real estate having a fair market value of $46,500, which they immediately mortgaged for $45,000 and

had to use the mortgage proceeds plus additional cash of their own to acquire Dorothy's 441 shares of stock. Petitioners ignore the fact that as a result of the surrender of their own stock to Capital and their acquisition of Dorothy's stock they gained control of the corporation, and that after Blackwood's stock was redeemed they owned all of the stock of the corporation. We believe our discussion above illustrates the fallacy of petitioners' argument when the entire transaction is taken into consideration. Of course, we recognize that book value is not necessarily indicative of the value of corporate stock, but we think it carries greater weight in determining value when the stock is all owned by one person, who can liquidate the corporation if need be, than where the stock is owned by various stockholders, none of whom have control.

Petitioners also express concern over William's basis in the stock he surrendered, if the distribution is taxed to him as an ordinary dividend, see Bittker, Federal Income Taxation of Corporations and Shareholders, sec. 7.82, "The mystery of the disappearing basis." We are not directly concerned with William's basis and make no effort to answer his question in this regard, except to point out that after the transactions were consummated petitioners still owned Elizabeth's and Dorothy's stock, as well as the real estate. Also see sec. 1.302–2(c), Income Tax Regs.

We are somewhat indirectly concerned by William's basis in his stock because it points up the difficulty of concluding that petitioners realized an economic benefit in 1961, taxable as a dividend in that year, equal to the fair market value of the real estate distributed to them. However, having concluded that the distribution was essentially equivalent to a dividend, we believe it follows as a matter of course under the law as written that section 302(a) does not apply to this transaction and that section 302(d) does apply; hence the distribution of the Town Street property to William is taxable as a dividend under section 301 (a) and (c)(1) and under section 316(a)(1). Under section 301(b)(1)(A) the amount of the dividend is the fair market value of the property distributed. Neither party suggested any alternative conclusion in the event we hold the distribution essentially equivalent to a dividend.

*Decision will be entered for the respondent.*