JOSEPH R. HOLSEY AND ELEANOR T. HOLSEY, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 60317. Filed August 8, 1957.

*Edward E. Burke, C. P. A.,* for the petitioners.
*William F. Fallon, Esq.,* for the respondent.

MULRONEY, *Judge:* The respondent determined a deficiency in income tax of petitioners in the amount of $41,385.34 for the taxable year 1951.

The sole issue for our determination is whether the payment of $80,000 by J. R. Holsey Sales Co. to a 50 per cent corporate stockholder in redemption of that stock constitutes a constructive taxable dividend to Joseph R. Holsey, the remaining stockholder, within the purview of section 115 (g), Internal Revenue Code of 1939.

FINDINGS OF FACT.

Most of the facts have been stipulated and are found accordingly.

Joseph R. Holsey and Eleanor T. Holsey are husband and wife residing in Westfield, New Jersey. They filed a joint Federal income tax return for the taxable year ended December 31, 1951, with the then collector of internal revenue at Newark, New Jersey. Eleanor T. Holsey is joined in this action solely by virtue of having participated in filing a joint return with her husband and therefore only Joseph R. Holsey will be referred to as petitioner.

J. R. Holsey Sales Co., a New Jersey corporation, is an Oldsmobile dealership organized on April 28, 1936, and since that time the petitioner has been president and a director thereof. Of the 2,500 shares of authorized no-par-value stock, only 20 shares were issued to Greenville Auto Sales Company, a Chevrolet dealership, hereinafter referred to as Greenville, in exchange for all of the right, title, and interest to the Oldsmobile franchise and other assets with respect to the franchise which had prior thereto been owned and operated by Greenville. The value assigned to the 20 shares of stock was $11,000.

Petitioner's father, Charles V. Holsey, owned in 1936, in excess of two-thirds of the outstanding stock in Greenville and petitioner was vice president and a director thereof. On April 30, 1936, Greenville

extended to the petitioner an option to purchase 50 per cent of the outstanding shares of J. R. Holsey Sales Co. for $11,000, and, within 10 years after the exercise of this option, an option to buy all the remaining shares for a sum to be agreed upon.

Greenville held all of the outstanding stock of J. R. Holsey Sales Co. from April 28, 1936, until November 1939, when petitioner exercised the first option, purchasing 50 per cent of the outstanding stock of J. R. Holsey Sales Co. for $11,000.

On June 28, 1946, petitioner was given a revised option to purchase the remaining shares of stock in the J. R. Holsey Sales Co., which permitted the petitioner to purchase such stock at any time up to and including June 28, 1951, for $80,000. The revised agreement ran to the petitioner individually and was not assignable by him to anyone except to a corporation in which he owned not less than 50 per cent of the common voting stock. On the date of the revised option, petitioner's father owned 76 per cent of the stock in Greenville and petitioner was vice president and director thereof.

On April 28, 1948, J. R. Holsey Sales Co. declared a 3-for-1 stock dividend and the no-par-value common stock was allocated a stated value of $750 per share. This increased the outstanding capital stock to 80 shares held in equal portions by the petitioner and Greenville.

On January 19, 1951, petitioner assigned the option agreement of June 28, 1946, to J. R. Holsey Sales Co., which, on the same date, exercised the option, paying Greenville $80,000 as the purchase price of the stock held by it. The purchase of such stock by the J. R. Holsey Sales Co. resulted in the petitioner's becoming the owner of 100 per cent of the outstanding stock of the J. R. Holsey Sales Co. Petitioner gave no effect to this transaction in his income tax return for 1951.

The principal officers and only directors of the J. R. Holsey Sales Co. from April 28, 1936, until December 31, 1951, were petitioner; his brother, Charles D. Holsey; and their father, Charles V. Holsey.

The earned surplus of the J. R. Holsey Sales Co. on January 19, 1951, was in excess of $300,000. From the time of its incorporation in 1936 up to and including December 31, 1951, the earned surplus and yearly cash dividends of the J. R. Holsey Sales Co. were as follows:

| Year | Earned surplus | Cash dividends | Year | Earned surplus | Cash dividends |
|------|----------------|----------------|------|----------------|----------------|
| 1936 | $310. 67 | | 1944 | $43, 956. 86 | |
| 1937 | 2, 413. 46 | | 1945 | 35, 862. 67 | |
| 1938 | 1, 497. 54 | | 1946 | 80, 687. 97 | $2, 000 |
| 1939 | 7, 299. 63 | | 1947 | 163, 537. 59 | 2, 000 |
| 1940 | 13, 706. 60 | $3, 200 | 1948 | 183, 851. 17 | 4, 000 |
| 1941 | 26, 664. 40 | 3, 000 | 1949 | 239, 583. 05 | 4, 000 |
| 1942 | 26, 446. 78 | | 1950 | 306, 979. 81 | 4, 000 |
| 1943 | 33, 877. 21 | | 1951 | 351, 738. 27 | 6, 000 |

The Oldsmobile franchise or Direct Dealer Selling Agreement, under which the J. R. Holsey Sales Co. operated, was a yearly contract en-

tered into by the corporation and the automobile manufacturer in reliance upon, and in consideration of, the personal qualifications and representations of the petitioner, as an individual. It was the manufacturer's policy to have its dealers own all of the stock in dealership organizations.

The respondent determined that the effect of the transaction between the J. R. Holsey Sales Co. and Greenville, wherein J. R. Holsey Sales Co. paid $80,000 to Greenville for one-half of its stock, constituted a dividend to the petitioner who was the remaining stockholder.

The net effect of the transaction, whereby the J. R. Holsey Sales Co. purchased 50 per cent of its outstanding stock from Greenville, leaving petitioner in complete ownership of the J. R. Holsey Sales Co., constituted a taxable constructive dividend to the petitioner.

OPINION.

The question here is whether the payment of $80,000 by J. R. Holsey Sales Co., in redemption of 50 per cent of its outstanding capittal stock, constituted the payment of a constructive taxable dividend to petitioner, the other 50 per cent stockholder of said corporation, under the provisions of section 115 (g) (1), Internal Revenue Code of 1939. The said section provides as follows:

SEC. 115. DISTRIBUTIONS BY CORPORATIONS.

(g) REDEMPTION OF STOCK.—

(1) IN GENERAL.—If a corporation cancels or redeems its stock (whether or not such stock was issued as a stock dividend) at such time and in such manner as to make the distribution and cancellation or redemption in whole or in part essentially equivalent to the distribution of a taxable dividend, the amount so distributed in redemption or cancellation of the stock, to the extent that it represents a distribution of earnings or profits accumulated after February 28, 1913, shall be treated as a taxable dividend.

It has long been held that, in order to constitute income taxable to the stockholder, actual receipt of the payment out of earnings is unnecessary, constructive receipt being sufficient. *Wall* v. *United States*, 164 F. 2d 462; *Thomas J. French*, 26 T. C. 263.

In the *Wall* case, the taxpayer gave notes for the purchase of stock in a corporation he then owned or controlled 100 per cent, and he then transferred the purchased stock to the corporation upon the corporation's agreeing to pay his notes. In the *French* case, the taxpayers borrowed money from the corporation to buy the stock of the majority stockholder and later surrendered a proportional part of their stock to the corporation, which then canceled their outstanding notes. In both cases it was held the corporate funds which were used to satisfy the taxpayers' obligations constituted the equivalent of taxable dividends.

Petitioner argues he could not be charged with constructive receipt of a dividend because the payment out of earnings was not made to

satisfy his legal obligation. Petitioner points out he merely had an option and he was under no obligation to make the $80,000 payment that was made by the corporation. There is no merit in the argument. The corporate act of payment could be *for* the stockholder and therefore *constructively received* by him without regard to whether it paid the stockholder's debt. The test is a benefit test—whether or not the payment was for the personal benefit of the stockholder and personal benefits can result to a stockholder in situations other than satisfying his obligations.

The question here is whether the payment by the corporation out of earnings was made at such time and in such manner as to be essentially equivalent to the distribution of a dividend. All of the facts and circumstances surrounding the transaction must be considered. *Commissioner* v. *Sullivan*, 210 F. 2d 607, affirming 17 T. C. 1420. "Whether a cancellation or redemption of stock is 'essentially equivalent' to a taxable dividend depends primarily upon the net effect of the distribution rather than the motives and plans of the shareholders or the corporation." *Estate of Charles D. Chandler*, 22 T. C. 1158, 1166. See also *Flanagan* v. *Helvering*, 116 F. 2d 937; *James F. Boyle*, 14 T. C. 1382, affd. 187 F. 2d 557, certiorari denied 342 U. S. 817; *Smith* v. *United States*, 121 F. 2d 692. In *Samuel Towers*, 24 T. C. 199, 227, we said:

> The principle to be applied in determining whether a distribution is essentially equivalent to a dividend under section 115 (g) is to determine the "net effect" of the distribution. Bad faith in making the distribution is not necessary to characterize it as one essentially equivalent to a dividend, *McQ[G]uire* v. *Commissioner*, (C. A. 7, 1936) 84 F. 2d 431, affirming 32 B. T. A. 1075 (certiorari denied 299 U. S. 591), but the taxpayers' motives and the plans and purposes of the corporation in making the distribution are relevant to determining whether or not the "net effect" of the distribution was essentially equivalent to a dividend. * * *

While the absence of a personal plan and motive in making the distribution will not characterize the transaction as not essentially equivalent to a taxable dividend, the presence of a personal plan and motive which is served by the distribution is strong evidence that the distribution is essentially equivalent to a dividend. Here we start with the proposition that from the very beginning of J. R. Holsey Sales Co. in April 1936, the plan was that petitioner was to have rights, which, if exercised, would result in his owning all of the stock of J. R. Holsey Sales Co. In 1946, when the option was extended, the plan was still that petitioner have rights that would secure for him all of the stock; only now the plan was changed slightly so that the option would be assignable by him. The parties were careful to see that the new option to buy 50 per cent of the stock would be assignable to a corporation in which the optionee owned 50 per cent of the stock. Obviously this meant the option would be

assignable only to J. R. Holsey Sales Co. The option was a valuable personal contract which would give petitioner all of the stock of J. R. Holsey Sales Co. with its earned surplus in January 1951 in excess of $300,000, by a payment to Greenville of $80,000. The assignment of the option contract to J. R. Holsey Sales Co. was clearly for the purpose of having that company pay the $80,000 in exercise of the option that was executed for petitioner's personal benefit. The payment was intended to secure and did secure for petitioner exactly what it was always intended he should get if he made the payment personally, namely, all of the stock in J. R. Holsey Sales Co. Clearly the net effect of the transaction was the distribution of a dividend to petitioner.

Petitioner argues in effect that the reacquiring of one-half of its stock by the corporation served a business purpose. That factor is to be considered. *Joseph W. Imler*, 11 T. C. 836. The argument is that the dealer contract executed by the manufacturer with J. R. Holsey Sales Co. was its most important asset, and the Oldsmobile Division of General Motors Corporation was unhappy about one of its stockholders (Greenville), owning one-half its stock, being a holder of the Chevrolet franchise. The division managers had made "suggestions" that this be "rectified or remedied" and they expected petitioner to own the Oldsmobile franchise in its entirety. The dealer contract was renewed yearly after negotiation and petitioner argues it might be helpful to the corporation in future negotiations to have divided stock ownership eliminated in accordance with the manufacturer's policy. But the manner of petitioner's acquisition of complete stock ownership was essentially that of using a dividend distribution for his personal benefit.

The argument is that divided stock ownership of an automobile sales corporation was not in accordance with the manufacturer's policy and therefore an expenditure from earnings to eliminate divided stock ownership was an expenditure from earnings for a legitimate corporate purpose and not a dividend distribution. It seems obvious that it would not be the business of a corporation to use its earnings to redistribute its stock amongst shareholders. Surely the fact that divided stock ownership was against the manufacturer's policy, would not make the purchase of stock from corporate earnings of one stockholder, and turning the stock over to the other, a true corporate purpose act, or, in fact, anything less than a dividend distribution to the remaining stockholder. And yet that is essentially what occurred here. The manufacturer's policy that was violated was in the stock ownership of the shareholders and it was up to the shareholders, not the corporation, to see, in the words of petitioner, that this was "remedied or rectified." It required no corporate act to remedy the situation. The "suggestions" of the manufacturer's representatives were obviously

that petitioner remedy the situation by securing all of the stock. This he did with the help of a payment out of earnings of $80,000. The corporation as an entity had not violated any policy of the manufacturer. It was not a corporate purpose to see to it that it have but one stockholder. It served the purpose of petitioner and not the corporation when it paid $80,000 out of earnings to aid petitioner in acquiring all of the stock, in accordance with the manufacturer's policy.

As was said in *Jackson Howell*, 26 T. C. 846, 855, where there was a distribution under somewhat similar circumstances:

It is no answer to say that these transactions [redemption of stock] had their origin in the demand of Chevrolet that the trust be eliminated as a stockholder. * * * It was an objective that the parties themselves would undoubtedly have desired to attain, wholly apart from any suggestion emanating from Connell [the manufacturer's representative]. * * *

Petitioner cites *Tucker* v. *Commissioner*, 226 F. 2d 177, reversing *Earle F. Tucker*, 23 T. C. 115. There a Ford automobile franchise holder sought to comply with the manufacturer's policy that the franchise holder own a controlling interest in the dealership corporation. A minority stockholder was agreeable to selling the franchise holder sufficient stock to give the latter a controlling interest for a price plus 20 per cent of the profits for 5 years. The franchise holder paid the named purchase price and had the corporation execute the contract to give the minority stockholder 20 per cent of the profits for 5 years. We held the yearly payments out of profits in the manner made were essentially equivalent to the payment of dividends to the franchise holder (23 T. C. 115). The Eighth Circuit reversed (226 F. 2d 177), holding the contract of the corporation with the minority stockholder was supported by a valuable consideration and for a proper corporate purpose in that it saved and preserved to the corporation its valuable franchise. In many respects the *Tucker* case is much like the instant case. In the *Tucker* case it might be said the evidence of corporate purpose was stronger in that the corporation would lose its dealership if the franchise holder did not get control of the corporation while here all that could be said would be that it would be helpful in renewal negotiations to eliminate divided stock ownership. But it is apparent to us in both instances the payment out of earnings was for the purchase price of stock that was designed to and did increase the stockholding of the taxpayers in the corporation making the payment. We will admit the rationale of the opinion of the Eighth Circuit in the *Tucker* case is opposed to the opinion herein expressed. With due respect to the opinion of that court, we decline to follow it.

There was another adjustment made by respondent which the parties agreed depended upon the outcome of the principal issue, therefore—

*Decision will be entered under Rule 50.*