Benjamin H. Freeman, Petitioner, *v.* Commissioner of Internal Revenue, Respondent

Estate of Ethel R. Freeman, Deceased, Leon I. Mesirov, Executor, and Benjamin H. Freeman, Petitioners, *v.* Commissioner of Internal Revenue, Respondent

Docket Nos. 95204, 95205. December 16, 1963.

*Leon I. Mesirov*, for the petitioners.
*Malin VanAntwerp*, for the respondent.

OPINION

Mulroney, *Judge:* The respondent determined a deficiency in docket No. 95205 in the 1957 income tax of Benjamin H. Freeman and the executor of the estate of his wife, Ethel, who had died in January of 1957, in the amount of $30,916.09. He also determined a deficiency in Benjamin's income tax for 1958 in the amount of $862.50. The adjustments giving rise to this latter deficiency for 1958 are not contested but refund is claimed by Benjamin if respondent's position in docket No. 95205 is upheld. The two dockets were consolidated and we need only consider the single issue presented in docket No. 95205. This issue is whether a payment of $51,102.70 to the executor of Ethel's estate by a corporation controlled by Benjamin for redemption of the corporation's stock was essentially equivalent to a dividened to Benjamin.

All of the facts have been stipulated and they are found accordingly.

Petitioner, Benjamin H. Freeman, resides at 421 Woodbine Avenue, Narberth, Pa. He filed timely income tax returns with the district director of internal revenue at Philadelphia, Pa., for 1957, jointly with the executor of his wife's estate, and for 1958 individually.

H. Freeman & Son, Inc., which will sometimes be referred to as the corporation, is a Delaware corporation of which Benjamin was a shareholder. On December 29, 1930, Benjamin executed two trust indentures wherein he was the grantor and Harry S. Mesirov was the trustee. One indenture which will be referred to as the "stock trust" conveyed

3,731.3 shares of common stock in the corporation to the trustee, to collect and dispose of the principal and income therefrom in the manner and upon the terms therein set forth. The terms were in general that the trustee pay all income to Benjamin for life and one-half of the income to Ethel if she survived him for as long as she remained his widow, and one-fourth of the income to Ethel for life in the event she remarried. The distribution of principal and income, not governed by the above specific events, was to Benjamin's brothers and sisters and their children. Paragraph Eighteenth of this trust indenture provided, as follows:

EIGHTEENTH. The Grantor reserves the right to revoke, alter and amend this instrument at any time, and from time to time, during his life, by the execution and delivery to the Trustee of an instrument in writing, signed and duly acknowledged by him; provided, however, that the duties or obligations of the Trustee shall not be increased without his consent.

By the second trust indenture which will be called the "insurance trust," Benjamin transferred to the same trustee "for safe-keeping" a $100,000 life insurance policy on his own life and naming the trustee as beneficiary. Benjamin retained all rights in the policy, including the right to dividends, the right to borrow on the policy, the right to surrender it for cash, and the right to change the beneficiary. The trustee was merely charged with the duty of safekeeping of the policy during Benjamin's life and after his death with collection of proceeds and disposition of same to Ethel and his brothers and sisters and their children, much like the distribution ordered in the stock trust. Here, too, in paragraph Nineteenth, Benjamin reserved the right to "revoke, alter and amend" similar to paragraph Eighteenth of the stock trust with the further provision that his change of beneficiary of the policy would work a revocation of the trust.

On April 15, 1933, Benjamin executed what is called a Supplemental Indenture. In the preamble of this instrument, reference is made to the stock trust and insurance trust indentures and the paragraphs that reserved his right to alter and amend both trusts. The Supplemental Indenture then states that this instrument is to alter and amend both trust indentures. Various paragraphs of both prior trust indentures are specifically revoked and in general the substitutes in the stock trust give Ethel $5,000 a year for life and her estate $50,000 in the event she died before Benjamin. Paragraph 3 of this instrument directed the trustee to invade the corpus if necessary to make the $5,000 annual payments unless Benjamin deposited with the trustee the amount necessary to make up the deficiency if the income of the corpus was less than $5,000.

Paragraph 6 of this Supplemental Indenture provided as follows:

6. If the said Ethel R. Freeman shall die in the lifetime of the Grantor, the Grantor shall thereupon forthwith deposit with the Trustee the sum of Fifty

thousand dollars ($50,000) in cash, and said sum shall immediately become subject to power of appointment of said Ethel R. Freeman by her Last Will and Testament; and the Trustee is hereby authorized and directed in such event to pay the said sum of Fifty thousand dollars ($50,000) to such person or persons and in such manner as said Ethel R. Freeman shall have directed, limited and appointed in and by her Last Will and Testament, after the same shall have been duly probated. And in the event that Grantor shall fail to deposit with the Trustee the sum of Fifty thousand dollars ($50,000) for the purpose and in the event aforesaid, the Trustee shall have authority and he is hereby directed to sell, pledge or otherwise use so much of the stock comprising the said stock trust estate, and/or to obtain a loan upon the life insurance policy or policies held by him under the Insurance Trust Agreement of December 29, 1930, as may be necessary to produce and place in the Trustee's hands for the said purpose the sum of Fifty thousand dollars ($50,000).

There were other provisions providing for application of the insurance proceeds in the event Ethel survived Benjamin, which we need not recite since that event did not occur. Paragraph 11 of this Supplemental Indenture provided, as follows:

11. The provisions of this Supplemental Trust instrument, so far as they relate to the said Ethel R. Freeman, are and shall continue to be absolutely irrevocable, except with the written consent of said Ethel R. Freeman; but the said Benjamin H. Freeman, as the Grantor in said Stock Trust Agreement of December 29, 1930, and as the Insured in said Insurance Trust Agreement of December 29, 1930, reserves the right to revoke, alter and amend the said instruments of December 29, 1930, and this instrument, at any time, and from time to time, during his life, so far as the same make provisions not affecting the said Ethel R. Freeman, in the same manner as is provided in said instruments of December 29, 1930.

It is stipulated that at the time of the execution of this Supplemental Indenture the book value of the stock in the trust was between $400,000 and $403,000.

By an agreement dated December 16, 1946, executed by Benjamin, the trustee, and Ethel, Benjamin was given the right to withdraw part of the stock trust "not exceeding in the aggregate Twenty-five hundred (2500) shares."

At the time the April 15, 1933, indenture was executed, divorce proceedings were pending between the Freemans, and a decree for absolute divorce was granted on July 10, 1933. The Freemans were remarried on August 15, 1934, and remained husband and wife until the death of Ethel R. Freeman.

Paragraph Second (a) of Ethel's will, which was duly admitted to probate in February of 1957 in Montgomery County, Pa., made disposition of the $50,000 made available for her testamentary appointment by paragraph 6 of the Supplemental Indenture of April 15, 1933. Leon I. Mesirov was appointed executor of her estate and trustee of the testamentary trust created by her will. None of the persons to whom Ethel's will appointed said sum of $50,000 was, or was a spouse of, a child, grandchild, or parent of Benjamin H. Freeman.

Following his qualifications as executor under Ethel's will, Leon I. Mesirov wrote to the successor trustees of the stock trust (who had been substituted as such for Harry S. Mesirov following his death) a letter dated March 21, 1957, calling attention to paragraph 6 previously quoted and demanding the "$50,000., together with interest thereon at the rate of 6% per annum from January 17, 1957, the date of her [Ethel's] death." This letter made the following suggestion:

I further suggest that if Mr. Freeman fails to furnish you with $50,000. in cash, I will accept, on or before April 17, 1957, in full satisfaction of that sum, 110 of the shares of the $50. par value common capital stock of H. Freeman & Son, Inc., a Delaware corporation, which comprise the principal of your trust and in exchange therefor release you from all further liability to account to me.

The successor trustees of the stock trust received the above letter and on March 22, 1957, they sent a letter to Benjamin enclosing a copy of the executor's letter, and demanding that Benjamin furnish them with $50,000 cash. Their letter to Benjamin further stated:

Upon your failure to do so [furnish the $50,000 cash] we shall comply with his suggestion and deliver to him [executor] 110 shares of the $50 par value common capital stock of H. Freeman & Son, Inc.

On March 23, 1957, Benjamin wrote to the successor trustees of the stock trust, acknowledging receipt of their letter and stating, as follows:

I will not furnish you with $50,000. but I consent and agree to your transferring to Leon I. Mesirov, as Executor and Trustee of my wife's estate, 110 shares of the $50. par value capital stock of H. Freeman & Son, Inc. in satisfaction of the obligation of the trust to her.

Further, all obligation of the trusts to her having been discharged, I am enclosing herewith a duly executed and acknowledged revocation of the trusts created by the two Agreements of Trust dated December 29, 1930, as amended by the Supplemental Indenture dated April 15, 1933 and by the Agreement dated December 16, 1946 and demanding that you return to me the remaining 1531.30 shares of that stock which you hold. I am prepared to give you, upon receipt of that stock, a receipt and release in full of all further liability to account to me for the administration of the trusts.

Thereafter on April 12, 1957, the trustees of the stock trust delivered to the executor of Ethel's estate, in exchange for his receipt and release, 110 shares of the capital stock of the corporation. On April 16, 1957, Ethel's testamentary trustee sold to the corporation for its treasury the 110 shares of its stock, being all of the stock in the corporation owned by Ethel's testamentary trust for $51,102.70 which he received in cash.

The trustees of the stock trust filed their income tax return on TD Form 1041 for their fiscal year ended March 31, 1958, reflecting in Schedule D thereof the said distribution of stock to Ethel's testamentary trustee as a sale creating a long-term capital gain of $48,576.75,

and in Schedule C thereof the fact that that gain was taxable to Benjamin who was then entitled to distribution of and did receive the remainder of principal of Benjamin's Trust.

Benjamin reported the said capital gain in Schedule D of his income tax return for the calendar year 1958 and paid the tax thereon.

Until the transfer by the successor trustees of the 110 shares of stock in the corporation to Leon I. Mesirov as testamentary trustee, petitioner, Benjamin H. Freeman, owned in his own name 1,282 shares of the capital stock of the corporation out of a total of 4,273 shares issued and outstanding (which total included 237 shares held by the corporation in its treasury). Immediately before the transfer on April 12, 1957, of the 110 shares to Leon I. Mesirov as trustee, the successor trustees of the stock trust owned on behalf of said trust, 1,641.3 shares of the capital stock of the corporation.

On April 16, 1957, the corporation had accumulated earnings and profits in excess of $51,102.70.

It is stipulated that since 1950 the corporation had acquired shares of its capital stock from various minority stockholders at prices approximating its book value. The book value of the stock on April 17, 1957, was between $464 and $475 a share.

In his notice of deficiency in docket No. 95205 respondent determined "that $51,102.70 paid to the trustee of the testamentary trust of Ethel R. Freeman, Deceased, on or about April 16, 1957, by H. Freeman & Son, Inc., constituted a dividend to Benjamin H. Freeman, for the taxable year ended December 31, 1957." His argument on brief is that the redemption of the 110 shares was essentially equivalent to the payment of a dividend to Benjamin H. Freeman within the provisions of section 302(b)(1), I.R.C. 1954.[1] Since the distribution by the corporation from its earnings and profits was not made directly to petitioner, it would have to have been made for his financial benefit before it could be said to resemble a dividend distribution to him. *Milton F. Priester*, 38 T.C. 316.

It is the position of respondent that petitioner was the owner of the redeemed stock for tax purposes at the time of redemption and that the transaction discharged his personal obligation to his wife's estate.

---

[1] SEC. 302. DISTRIBUTIONS IN REDEMPTION OF STOCK.

(a) GENERAL RULE.—If a corporation redeems its stock (within the meaning of section 317(b)), and if paragraph (1), (2), (3), or (4) of subsection (b) applies, such redemption shall be treated as a distribution in part or full payment in exchange for the stock.

(b) REDEMPTIONS TREATED AS EXCHANGES.—

(1) REDEMPTIONS NOT EQUIVALENT TO DIVIDENDS.—Subsection (a) shall apply if the redemption is not essentially equivalent to a dividend.

*       *       *       *       *       *       *

(3) TERMINATION OF SHAREHOLDER'S INTEREST.—Subsection (a) shall apply if the redemption is in complete redemption of all of the stock of the corporation owned by the shareholder.

Petitioner argues the estate was the owner of the redeemed stock at the time of the redemption and the redemption did not discharge any obligation he owed to his wife's estate.

The issue is one of fact. *John A. Decker*, 32 T.C. 326, affirmed per curiam, 286 F. 2d 427. The stipulated facts support petitioner.

Respondent argues petitioner had retained to himself exclusive control of the corpus of the trust so that for tax purposes the trusteed stock will be treated as owned by petitioner, citing *Helvering v. Clifford*, 309 U.S. 331. There is no merit in the argument. As long as the trust was in existence, the exclusive control of the corpus was in the trustee. The trusteed stock was irrevocably subjected to the satisfaction of the trust obligations to Ethel or her estate. The trust indenture gave petitioner the possibility of regaining exclusive control of all of the stock in the trust with the written consent of his wife so long as she lived and after her death by electing to pay over $50,000 to her estate. Petitioner had no control at all over the 1,531.3 shares of stock that were in the trust when Ethel died. He had no control over the stock at the time redemption was made since he had not paid the $50,000 cash and could not exercise any right of revocation until the trust obligation to Ethel's estate was satisfied.

Respondent seems to argue the redemption was for petitioner's financial benefit because the redemption of the stock was the last step in a plan, instigated by petitioner, that would accomplish the payment by the corporation of his $50,000 obligation to his wife's estate. Such an argument must assume that petitioner had an obligation to pay his wife's estate $50,000. Respondent sees such an obligation by first interpreting paragraph 6 of the trust indenture as creating an obligation on the part of petitioner to place $50,000 cash with the trustee for the estate's benefit. In other words, under respondent's argument, petitioner's obligation to his wife's estate is to pay $50,000 to the trust for transmittal by the trustee to his wife's estate.

We would not construe paragraph 6 of the Supplemental Indenture of April 15, 1933, as creating a primary obligation on the part of petitioner to deposit $50,000 in cash in the trust. A trust indenture is a method of disposing of property that the settlor already has. It is not designed to create a personal obligation for the settlor's future deposit of funds with the trustee, for that would be a contract to make a trust. Restatement, Trusts, sec. 74 (1959). This supplemental trust indenture of April 15, 1933, contains none of the requirements for the formation of a binding contract to pay $50,000 over to the trustee. It was executed only by the petitioner as the conveyor of property and the trustee he named who merely consented to the assumption of duties imposed by the settlor.

We feel said paragraph 6 should be construed as giving petitioner the option but not the obligation to deposit the $50,000 and thus relieve the stock from subjection to use for a trust obligation. With complete power to alter or revoke, after the trust obligations to Ethel or her estate were satisfied, it is understandable he would reserve some right to supply the required cash and preserve his right to regain the uninvaded corpus. The situation here is somewhat like *Holsey* v. *Commissioner*, 258 F. 2d 865 (reversing 28 T.C. 962), where the 50-percent stockholder had an option to purchase the remaining stock and he assigned the option to the corporation and had it buy the stock and it was held this was not equivalent to a dividend to the stockholder.[2]

Our interpretation of paragraph 6 as not creating a personal obligation on the part of petitioner to pay over $50,000 cash to the trustee can be tested by asking the question: Who could sue him if he did not do it? The executor of Ethel's estate would have no right of action against petitioner. And the trustee of the stock trust was given no right of action against the settlor by the trust indenture. The instrument spells out in detail what he is to do "in the event that Grantor shall fail to deposit" the said $50,000 cash. He is "to sell, pledge or otherwise use" the stock or obtain a loan on the insurance policy in the insurance trust for the purpose of satisfying the trust's $50,000 obligation to Ethel's estate.

In any event, even if it be assumed petitioner had some obligation to pay the trust that obligation ended when the trust turned over 110 shares of stock to the estate in complete discharge of its obligation under paragraph 6. This was stock that had irrevocably left petitioner's hands some 24 years earlier. Whatever interpretation is placed on paragraph 6 with respect to the settlor's obligation, it must be admitted it places an absolute obligation on the trustee to pay the estate and to use the trusteed stock for that purpose if necessary. In short, it was the trust's transfer of stock that it owned that settled and ended any claim the estate owned for $50,000. This was before the stock was ever offered for redemption by the new stockholder, the estate. But respondent argues the quick series of events such as the three letters of March 21, 22, and 23, 1957, and the redemption on April 12, 1957, indicate a prearrangement that the stock would be redeemed. A short answer to this argument is that no stock in which petitioner had any interest was ever transferred to the estate. Even if the sequence of events might be said to point to a petitioner-inspired offer of the stock for redemption by the estate, it would be of no consequence. The only possible benefit petitioner would receive from such redemption of stock that he had neither owned nor controlled

[2] We decided to follow the reversal of our opinion in *Holsey* v. *Commissioner* in *Milton F. Priester*, 38 T.C. 316.

**386**

would be the indirect benefit of becoming the sole stockholder of the corporation. This is not a sufficient financial benefit to make him the recipient of a distribution similar to a dividend. *Milton F. Priester, supra.*

We hold the redemption was not essentially equivalent to a dividend distribution to petitioner. There were other issues that were not contested or were conceded.

*Decisions will be entered under Rule 50.*