B.H. WILLIAMS and VIVIAN L. WILLIAMS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent WALTER CHEVROLET-OLDS, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Williams v. Comm'r
Docket Nos. 2083-75, 2091-75. United States Tax Court
T.C. Memo 1976-368; 1976 Tax Ct. Memo LEXIS 27; 35 T.C.M. (CCH) 1672; T.C.M. (RIA) 760368; December 6, 1976, Filed J. Kerney Dossett and Lauch M. Magruder, Jr., for the petitioners. Robert W. West, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined deficiencies in Federal income taxes of petitioners as follows: Docket
Taxable No.
Year Ended
Deficiency
2083-75
12/31/70
$ 29,989.77
2083-75
12/31/71
270.39
2091-75
10/31/70
51.55
2091-75
10/31/71
1,166.01
Upon joint motion of the parties, these cases were consolidated for trial, briefing and opinion. The following issues are presented for our decision: *31 (1) Whether the March 1, 1970, stock transaction entered into between Mr. Fagan and Petitioner Walter Chevrolet-Olds, Inc., was a redemption of Mr. Fagan's stock or was, in reality, a purchase of said stock by Petitioner B.H. Williams; (2) Whether Petitioner Walter Chevrolet-Olds, Inc., overstated interest expense for its taxable year ended October 31, 1971, by including therein interest on a note which it gave to Mr. Fagan in the above-mentioned stock transaction; (3) Whether Petitioner Walter Chevrolet-Olds, Inc., overstated costs of goods sold for its taxable year ended October 31, 1971, by including therein a portion of the cost of an automobile transferred to Mr. Fagan in connection with the above-mentioned stock transaction; (4) Whether Petitioner Walter Chevrolet-Olds, Inc., overstated insurance expense for its taxable years ended October 31, 1970 and October 31, 1971, by including therein premiums paid for life insurance insuring the life of Petitioner B.H. Williams, and whether such payment resulted in dividend income to Petitioners B.H. and Vivian Williams; and (5) Whether Petitioners B.H. and Vivian Williams should have included in gross income for each of their *32 taxable years 1970 and 1971 the fair rental value of their personal use of a demonstrator automobile furnished to Petitioner B.H. Williams by Petitioner Walter Chevrolet-Olds, Inc. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts, supplemental stipulation of facts and attached exhibits are incorporated by reference. B.H. Williams, hereinafter referred to as petitioner, and Vivian L. Williams, husband and wife who resided in Magee, Mississippi, at the time of filing their petition herein, filed joint Federal income tax returns for the taxable years 1970 and 1971 with the Internal Revenue Service Center, Chamblee, Georgia. Walter Chevrolet-Olds, Inc., hereinafter referred to as the corporation, is a Mississippi corporation whose principal business activity is the retail sale and service of automobiles under franchises from the Chevrolet and Oldsmobile divisions of General Motors Corp. At the time of filing its petition herein, the corporation's principal place of business was Magee, Mississippi. The corporation, using the accrual method of accounting, filed its Federal income tax returns for the taxable years ended October 31, 1970 and October 31, 1971, with *33 the Internal Revenue Service Center, Chamblee, Georgia. Petitioner was general manager and a shareholder of the corporation throughout 1970 and 1971. On January 2, 1970, there were 200 shares of common stock of the corporation outstanding. Mr. Walter Fagan, Jr., who had been a Chevrolet dealer in Magee, Mississippi, since 1934, owned 150 shares and petitioner owned 50 shares which he acquired from Mr. Fagan on April 1, 1966. The stock was evidenced by certificates No. 3 and 4 for 100 shares each, which were issued to Mr. Fagan and were being held by the Deposit Guaranty National Bank as collateral for a loan from the bank to the corporation. The shares were pledged at the time petitioner acquired his 50 shares from Mr. Fagan. In early 1970, Mr. Fagan decided to dispose of his stock interest in the corporation. Petitioner and Mr. Fagan examined the financial records of the corporation and decided that the net worth method would be a fair appraisal of the value of Mr. Fagan's shares. At that time, petitioner expressed an interest in discussing the matter further. However, Mr. Fagan suggested that Mr. Paul Jorgensen, a certified public accountant who handled tax and financial *34 matters for petitioner, Mr. Fagan and the corporation, should first be consulted. Subsequently, the parties met with Mr. Jorgensen and he recommended that Mr. Fagan's shares be redeemed by the corporation. Mr. Jorgensen based his recommendation on petitioner's financial inability to purchase the interest in his individual capacity and the favorable net cash flow which would result if a redemption were undertaken. Acting on the advice of Mr. Jorgensen, the board of directors, consisting of petitioner, Mr. Fagan and Mr. Dick Welsh, agreed that the corporation would redeem Mr. Fagan's stock. The corporation operated under the General Motors Dealers Capital Standard Program which requires that a minimum "owned net working capital" be maintained at all times. This amount must be supplied through capital stock or other investment or earnings. The owned net working capital is, in essence, the amount by which current assets exceed current liabilities. However, all current asset reserves and all liabilities, except obligations secured by mortgages on real property, are deducted from total current assets. The amount of the minimum "owned net working capital" is set by Chevrolet and *35 is subject to change as dictated by business exigencies. Under the program, the corporation is required to submit monthly financial statements indicating the current "owned net working capital" to Chevrolet. Similar statements are submitted to General Motors Acceptance Corp. which floor-plans the corporation's automobiles and purchases its commercial paper. Under the Dealer Capital Standard Agreement dated December 14, 1967, the corporation was required to maintain $70,995 of owned net working capital for periods beginning December 14, 1967. For periods beginning January 1, 1973, $160,099 was called for under the agreement dated May 7, 1973. The minimum Capital Standard Agreement for periods beginning December 14, 1967, was in effect on March 1, 1970. For the period beginning January 1, 1970 and ending March 31, 1970, the corporation had total current assets of $403,915.51 and total current liabilities of $292,896.20. Its working capital was, therefore, $111,019.31. The corporation's financial statement for that period indicated a total owned net working capital of $111,001.31. Had the corporation's obligation to Mr. Fagan in the amount of $84,000 been entered on its balance *36 sheet, the working capital would have been reduced to $27,019.31 for the period ended March 31, 1970. Chevrolet must approve any change in capital ownership; therefore, after the plan of redemption was approved by the directors of the corporation, petitioner and Mr. Fagan discussed the proposed transaction with the Chevrolet zone manager in New Orleans. The redemption was approved at the zone level; however, petitioner was later advised that if the redemption liability were shown on the corporate books it would violate General Motor's minimum dealer capital requirement. In an attempt to assuage this problem, Mr. Fagan assured the zone manager that he would assist the corporation should it encounter financial difficulties. On March 1, 1970, Mr. Fagan entered into an agreement with the corporation under which he would receive $84,000, which was the book value of his stock. The agreement provided for a down payment on his stock. The following consideration was received by Mr. Fagan: Check of B.H. Williams issued to Mr. Fagan
$15,000.00
Check of Walter Chevrolet-Olds, Incsh4,627.55
Assumption by Walter Chevrolet-Olds of
Mr. Fagan's debt due James Sikes
5,000.00
1970 Oldsmobile Sedan
3,372.45
TOTAL
$28,000.00
*37 The March 1, 1970, agreement was modified by letter dated June 15, 1970, wherein the corporation agreed to transfer the demonstrator automobile valued at $3,372.45 and Mr. Fagan would reduce the outstanding balance from $59,370.45 to $56,000; thus, the automobile was distributed in partial payment for the stock of the corporation. In addition, Mr. Fagan received the corporation's installment note payable in five equal, annual installments of $11,200 beginning January 15, 1971. The agreement did not specify the consideration that Mr. Fagan was to give in exchange. However, he sold his stock and resigned his position in the corporation. Chevrolet personnel, at the zone level, were aware of the plan of redemption and they required that the corporation's liability under the plan not be shown on the corporate books. Actual examination of the corporation's books are made by Chevrolet officials at the district level, which is a step below the zone level, and district officials were unaware of the plan of redemption. In an effort to conceal the transaction, petitioner instructed the bookkeeper not to reflect the redemption payments on the corporation's books. Therefore, the corporation's *38 check in the amount of $4,627.55, dated June 15, 1970, was recorded as a debit to accounts receivable--B.H. Williams and credited to cash. Of the $5,000 debt owed to Mr. Sykes by Mr. Fagan and assumed by the corporation, $1,000 was debited to retained earnings; the remaining $4,000 was debited to retained earnings on December 31, 1972. The 1970 Oldsmobile transferred to Mr. Fagan as part of the down payment under the redemption transaction had been purchased by the corporation in 1969 from General Motors for $3,782.49. Mr. Fagan had used the automobile as a demonstrator since November 1969; pursuant to the letter dated June 15, 1970, title was transferred to Mr. Fagan on February 10, 1971. On the corporation's general journal for February 1971, account No. 406 (Oldsmobile Inventory) and account No. 210 (Notes Receivable--Customers) were debited in the respective amounts of $410.04 and $3,372.45. A credit of $3,782.49 was entered in account No. 231 (New Car Inventory) and the corporation included $410.04 in its cost of goods sold for its taxable year ended October 31, 1971. This amount represents the difference between the cost of the automobile and its value at the time of *39 the transfer. The corporation's promissory note in the amount of $56,000 and the $15,000 advanced to the corporation by petitioner were not reflected on the corporation's books. The $15,000 advanced to the corporation was a loan to the corporation from petitioner. Petitioner has been repaid approximately $5,000 of the amount advanced by him, and payments made on the $56,000 note are reflected on the books of the corporation. Mr. Thomas L. Clark, a certified public accountant associated with Mr. Jorgensen, made an adjusting entry for the year ended October 31, 1972, and posted it to the books on January 31, 1973, to reflect the redemption in a more accurate manner. Account No. 370 (Retained Earnings) was debited in the amount of $23,000. Account No. 220 (Accounts Receivable) and account No. 314 (Notes Payable-- B.H. Williams) were credited in the respective amounts of $8,000 and $15,000. However, Mr. Clark did not enter the unpaid balance on the note payable to Mr. Fagan on the corporation's books because it would have damaged the "net working capital position" and invited severe criticism from GM and GMAC. Under the terms of the Amrch 1, 1970, agreement, Mr. Fagan was *40 to receive annual payments in the amount of $11,200 plus interest for a period of five years. On January 12, 1971, the corporation issued its check No. 1261 in the amount of $11,200 to Mr. Fagan. This payment was recorded on the corporation's books as a debit to capital stock in the amount of $2,00 and a debit to earned surplus in the amount of $9,200. A credit to cash in the amount of $11,200 was also entered. Check No. 1248 in the amount of $4,350, representing interest due on January 15, 1971, was issued to Mr. Fagan on December 31, 1970. This payment was charged to interest expense. On January 12, 1972, the second annual installment on the note was paid to Mr. Fagan. However, the payment of principal had been reduced by agreement between Mr. Fagan and the corporation from $11,200 to $5,600. Therefore, payment was made in the amount of $9,632 of which $5,600 was charged to earned surplus and $4,032 was charged to interest expense. The January 12, 1971, charge to capital stock created some misunderstanding with General Motors Acceptance Corp.; therefore, the corporation did not make a charge to capital stock. Throughout this period, stock certificates No. 3 and 4 continued *41 to be held by the Guaranty National Bank as collateral for a loan to the corporation. In January 1972, the loan was repaid and the certificates were delivered to the corporation. From March 1, 1970 until January 13, 1972, 50 shares were beneficially owned by petitioner and 150 shares were beneficially owned by the corporation. On January 13, 1972, stock certificates No. 5 and 6 were issued to petitioner in his name and certificates No. 3 and 4, previously held by the Guaranty National Bank, were canceled. Certificates No. 5 and 6 evidenced 100 shares each and represented all of the outstanding common stock of the corporation. These transactions were recorded on the corporation's stock certificate book. At the time certificates No. 5 and 6 were issued, petitioner owned 50 shares of stock in the corporation. However, he was issued 200 shares of stock. This was done so that shares outstanding, which were examined periodically by Chevrolet personnel, would correspond with the financial statements submitted to General Motors and because the January 12, 1971, charge to capital caused concern to GMAC, which financed automobiles sold by the corporation. In the initial discussions *42 with Revenue Agent Luther W. Key, petitioner told Agent Key that he purchased Mr. Fagan's stock. However, in conversations with Agent Key, petitioner did not distinguish between himself and the corporation. Petitioner was the sales manager and a salesman for the corporation. For many years, the corporation furnished each of its salesmen a demonstrator automobile. The corporation did not require an accounting of the use of the car and the salesmen were not required to reimburse the corporation for their personal use of the cars. Petitioner was furnished a Chevrolet demonstrator automobile for both of the taxable years under consideration. Although it was used primarily for business, petitioner also made personal use of the car. Petitioner, for valid business reasons, used his personal Oldsmobile automobile for the business of the corporation. For example, his personal Oldsmobile was used to attend Oldsmobile meetings. He was not reimbursed for the business use of his personal car, and he did not claim a tax deduction for such use. The demonstrators were changed three times each year. Thus, petitioner drove three different automobiles for a total of approximately 15,000 *43 to 18,000 miles each year. Petitioner did not maintain any record of the amount of time the demonstrator was used for personal, as opposed to business, purposes. A life insurance policy was issued by Metropolitan Life Insurance Co. in June 1970 on the life of petitioner with his wife, Vivian L. Williams, as the beneficiary. It was issued under the General Motors dealers program. Premiums were paid by the corporation beginning June 1970 in the amount of $45 per month. The Commissioner, in his statutory notice of deficiency, determined that petitioners received taxable dividend income in the amounts of $64,585.45 and $440 for the taxable years 1970 and 1971, respectively, consisting of payments for Mr. Fagan's stock and life insurance premiums. He further determined that petitioner received taxable income in the amount of $600 for each of the taxable years 1970 and 1971 resulting from the personal use of an automobile furnished to him by the corporation. The Commissioner determined that the corporation overstated its insurance expense for the taxable years ending October 31, 1970 and October 31, 1971, in the respective amounts of $225 and $540 and that the corporation overstated *44 its costs of goods sold for the taxable year ended October 31, 1971, in the amount of $410.04 and overstated its interest expense in the amount of $4,350 for the taxable year ended October 31, 1971. OPINION Issue 1. The Stock Transaction.
The first issue presented for our decision is whether the stock redemption agreement between Mr. Fagan and the corporation resulted in a constructive dividend to petitioner taxable under sections 301[1] and 316, [2] Internal Revenue Code of 1954. *45 This question, arising under varying factual settings, has been the subject of considerable litigation. Herein, respondent concedes that petitioner was under no obligation to purchase Mr. Fagan's stock, but asserts that the corporation purchased the stock for his benefit and, although cast as a redemption, the transaction was in reality a sale to petitioner and, therefore, the purchase price paid by the corporation constitutes a constructive dividend to petitioner. When a corporation redeems its stock, an indirect benefit to a continuing shareholder results because of his increased proportionate interest in the corporation. However, the assets of the corporation are at the same time reduced; therefore, the value of the continuing shareholder's interest in the corporation is not increased. The mere increase in proportionate interest is not sufficient to warrant constructive dividend treatment. See, Holsey v. Commissioner,258 F.2d 865 (3d Cir. 1958), revg. 28 T.C. 962 (1957). [3] This result is consistent with section 302 of the Code which prescribes precise rules to insure that a qualifying, redeeming shareholder is not subjected to dividend treatment. *46 It would be anomalous if the provision of section 302, designed to facilitate shifts in corporate ownership by stock redemption, could be so easily vitiated by the threat of dividend income to the continuing shareholders. To produce a constructive dividend to a continuing shareholder, a corporate distribution must directly benefit that shareholder; thus a corporate redemption must relieve that shareholder of a primary, unconditional personal obligation in connection with the purchase of the redeemed shares by the corporation. Holsey v. Commissioner,supra;Herbert Enoch,57 T.C. 781 (1972); Milton F. Priester,38 T.C. 316 (1962). *47 Therefore, the question is, in essence, did the corporation here discharge a personal obligation of petitioner when it made payments to Mr. Fagan for his stock. Respondent contends, under principles analogous to those applied in Commissioner v. Court Holding Co.,324 U.S. 331 (1945), that the transaction did, in reality, take place at the shareholder level and that his determination is supported by Louis H. Zipp,28 T.C. 314 (1957), affd. per curiam 259 F.2d 119 (6th Cir. 1958), cert. denied 359 U.S. 934 (1959), and the following language found in Rev. Rul. 58-614, 1958-2 C.B. 920: In the future, the Service will not treat the purchase by a corporation of one shareholder's stock as a dividend to the remaining shareholders merely because their percentage interests in the corporation are increased. On the other hand, if the stock is in reality purchased by a remaining shareholder and paid for by the corporation, then, regardless of the form of the transaction, the payment will be considered a dividend to the shareholder who made the purchase. * * * [Emphasis added.] In Louis H. Zipp,supra, *48 there were 50 shares of the Paramount Corp. outstanding; 48 were issued to Monroe and Bernard Zipp while two shares were issued to Louis Zipp. Of the 48 shares issued in the names of Monroe and Bernard Zipp, 46 shares were held as nominees for Louis Zipp. A serious dispute arose over the operation of the corporation and Monroe and Bernard Zipp decided to purchase Louis Zipp's interest. Lacking sufficient personal resources to do so, they negotiated a loan from the Luira Corp. to Paramount to be utilized in the stock purchase. They then notified Mr. Zipp that they would purchase his interest in Paramount. Subsequently, Louis Zipp sold his stock to Paramount; however, the 46 shares held by Monroe and Bernard Zipp as nominees remained in their names. Herein, Mr. Fagan decided to retire and dispose of his interest in the corporation in early 1970. Soon thereafter, he discussed the matter with petitioner and Mr. Paul Jorgensen, a CPA who previously handled tax and financial matters for all of the parties. Mr. Jorgensen recommended that the corporation redeem Mr. Fagan's stock. Indeed, the transaction from its inception took the form of a stock redemption which was submitted *49 to and ratified by the corporation's board of directors at a time when petitioner was a minority shareholder. There is no evidence to indicate that a stock purchase by petitioner was ever seriously considered. Respondent, noting that Chevrolet zone officials were aware of the putative redemption, contends that the entries made on the corporation's financial records indicate that the parties intended that petitioner acquire Mr. Fagan's interest in the corporation. We disagree. Petitioner consistently maintained that Chevrolet zone officials were cognizant of the redemption agreement but, because Mr. Fagan gave his assurance that he would aid the corporation should it encounter financial difficulty, merely required that the liability therefor not be reflected on the corporation's financial records. The entries support petitioner's position. By charging the $4,627.55 check issued as part of the downpayment to accounts receivable--B. H. Williams, and the $3,372.55, representing the fair market value of the automobile, to notes receivable--customers in February 1971, the net working capital position of the corporation as it appeared on the books was improved. In addition, neither *50 the $15,000 advanced to the corporation by petitioner for use as part of the down payment nor the $56,000 note from the corporation to Mr. Fagan were reflected on the corporation's financial records. This was consistent with the admonition of the Chevrolet zone official against visably violating the net working capital requirement. Moreover, the January 12, 1971, initial installment on the note of the corporation to Mr. Fagan was charged to capital stock and earned surplus. This is consonant with the treatment generally accorded to a corporate redemption.
The January 12, 1972, installment was charged in its entirety to earned surplus because the January 12, 1971, charge to capital stock caused concern to GMAC, which was unaware of the redemption agreement. This also supports petitioner's explanation of the erroneous book entries. Adjusting entries, posted to the corporation's books on January 31, 1973, by Mr. Clark, the corporation's new accountant, also indicate that the stock transaction was intended to be a corporate redemption. Therefore, we hold that book entries do not evidence that petitioner acquired Mr. Fagan's stock. In addition, they do not prove that petitioner incurred *51 a primary obligation to pay for said stock. In his final salvo, respondent contends that the issuance on January 13, 1972, of 200 shares of stock to petitioner in conjunction with petitioner's characterization of the transaction to Revenue Agent Key as a purchase by him of Mr. Fagan's stock interest is sufficient to establish that the transaction was in reality a stock purchase by petitioner and, therefore, citing Zipp, the corporation's payment to Mr. Fagan directly benefited petitioner and thus constitutes a constructive dividend. Initially, we point out that although petitioner may have so characterized the transaction in his initial meeting with Agent Key, Agent Key also acknowledged that petitioner did not distinguish between himself and the corporation which he then controlled, thus little weight is accorded this statement. In Louis H. Zipp,supra, the retiring shareholder's stock, ostensibly redeemed by Paramount corporation, was registered in the name of and was in the possession of the continuing shareholders. After the redemption, it continued to be so registered and held. Moreover, the continuing shareholders negotiated the purchase and arranged *52 for financing which enabled Paramount to pay for the retiring shareholder's stock. We held that corporate funds were removed from corporate solution by the shareholders to enable them to acquire the retiring shareholder's stock. There was no evidence introduced to establish that Paramount was discharging its own obligation rather than that of its continuing shareholders; hence, the corporate payment was taxable to the continuing shareholders as a constructive dividend. Herein, there is no such convincing evidence to indicate that petitioner was to acquire Mr. Fagan's stock. After the transaction, all of the outstanding stock continued to be held by the Guaranty National Bank in Mr. Fagan's name; however, the corporation was the beneficial owner of the 150 redeemed shares. Subsequently, petitioner, cognizant of the problems caused by the January 12, 1971, $2,000 charge to capital stock, learned that the stock certificates had to be physically examined and certified by Chevrolet officials. It was, therefore, necessary that the number of outstanding shares of stock he possessed correspond with the number shown on the financial statements submitted to Chevrolet. Thus, owing to subsequent *53 events, petitioner was persuaded to cause the corporation to issue the additional 150 shares in his name on January 13, 1972.The decision to issue the additional stock was made well after the stock redemption transaction and was not part of that transaction. [4]
Indeed, after having observed the demeanor of each witness and carefully reviewing the entire record, we are convinced that the substance, as well as the form of the transaction, was a corporate redemption of Mr. Fagan's stock with the corresponding increase in petitioner's proportionate interest in the remaining assets of the corporation. Petitioner did not incur a personal obligation to purchase or to pay for Mr. Fagan's stock. Therefore, the redemption of that stock did not discharge a personal obligation of petitioner which, owing to the economics of an isolated corporate redemption, is a prerequisite to *54 finding that petitioner received a constructive dividend. Richard B. Bennett,58 T.C. 381 (1972); Herbert Enoch,57 T.C. 781 (1972). The language of the Ninth Circuit in Niederkrome v. Commissioner,266 F.2d 238 (9th Cir. 1958), is apposite to the facts herein: It is apparently held recently that there must be some real financial or economic value to the remaining stockholders in the redemption of the holdings of another before a tax is due from the former. Holsey v. Commissioner, 3 Cir., 258 F.2d 865. Schmitt v. Commissioner, 3 Cir., 208 F.2d 819. It is true the case of Zipp v. Commissioner, 6 Cir., 259 F.2d 119, held that, where a majority stockholder sells his stock to minority stockholders, who use corporate funds to pay therefor, the sum paid is taxable as a dividend to those who purchase. However, in the case at bar, the taxpayers did not buy or agree to buy the stock. The Zipp holding has been severely criticized. And it has been said that, if there had been no sale to stockholders, a dividend determination could have been avoided by the remaining stockholders. [Footnotes omitted. *55 ] [266 F.2d at 243.] Accordingly, we hold that the corporation's payments to Mr. Fagan did not result in constructive dividends to petitioner. Issue 2. Interest Expense Deduction.
Respondent stated on brief that the resolution of this issue is governed by our decision on the first. We agree. Therefore, having decided that the stock transaction was a redemption of Mr. Fagan's stock, we hold that the interest expense of $4,350 was attributable to the corporation's obligation under the redemption agreement and, therefore, was properly accrued and deducted by Petitioner Walter Chevrolet-Olds, Inc., for its taxable year ended October 31, 1971. Issue 3.$410.04 Charge to Cost of Goods Sold.
Respondent maintains that Petitioner Walter Chevrolet-Olds, Inc., overstated cost of goods sold for its taxable year ended October 31, 1971, in the amount of $410.04. This is the amount by which the cost of the demonstrator automobile distributed to Mr. Fagan as partial payment in redemption of his stock exceeded its value, as agreed by the parties, at the time of transfer. Respondent views this amount as properly chargeable to surplus, while Petitioner Walter Chevrolet-Olds, *56 Inc., contends that it is entitled to charge this portion of the cost of the automobile to cost of goods sold in the year of its disposition. [5] In essence, section 311(a)[6] and the regulations [7] promulgated thereunder provide, with certain exceptions not here relevant, that gain or loss is not recognized by a corporation on the distribution of property in redemption of its stock. It is clear that an addition to cost of goods sold results in the reduction of gross revenue; therefore, to allow Petitioner Walter Chevrolet-Olds, Inc., to charge the $410.04 to costs of goods sold would, in effect, result in the recognition of a loss in violation of the clear mandate of section 311. [8] Accordingly, we decide this issue in favor of respondent. *57 Issue 4. Insurance Premiums.
In June 1970, a life insurance policy was issued by Metropolitan Life Insurance Co. to Petitioner B. H. Williams under the GM dealer group life plan. Premiums were paid by the corporation and Petitioner Vivian L. Williams was the named beneficiary. The Commissioner determined that Petitioner Walter Chevrolet-Olds, Inc., overstated insurance expense for its taxable year ended October 31, 1971, and October 31, 1972, by including therein the premiums paid on the above-described policy. In addition, he determined that the premium payments constituted dividend payments to Petitioners B. H. and Vivian L. Williams. It is fundamental that the Commissioner's determination of a tax deficiency is presumed to be correct and the burden of proof is upon petitioners to show error therein. Welch v. Helvering,290 U.S. 111 (1933); Rule 142, Tax Court Rules of Practice and Procedure.
The evidence adduced with respect to the insurance policy and the corporation's premium payment thereon can best be described as scanty. No attempt has been made to establish a business purpose for the premium payments or to refute the contention that such *58 payments were dividends. [9] Moreover, petitioners made no argument on brief regarding the premium payments and have apparently conceded the issue.Accordingly, we hold that petitioners have failed in their burden of proof on this issue and, therefore, the determination of the Commissioner is sustained. Rule 149(b), Tax Court Rules of Practice and Procedure.
Issue 5. Personal Use of the Demonstrator Automobile.
The Commissioner determined that Petitioners B. H. and Vivian Williams should have included $600, representing the fair rental value of petitioners' personal use of the demonstrator automobile, in income for each of their taxable years 1970 and 1971. Petitioners contend that any such personal use of the demonstrator was more than offset by the use of their personally owned Oldsmobile for demonstration and other business use. It is firmly established that the fair rental value of the personal use of business property is includable in income of a shareholder or employee. Motel Company v. Commissioner,340 F.2d 445 (2d Cir. 1965), *59 affg. a Memorandum Opinion of this Court; United Aniline Company v. Commissioner,316 F.2d 701 (1st Cir. 1963), affg. a Memorandum Opinion of this Court; Estate of William F. Runnels,54 T.C. 762 (1970); Gordon S. Dole,43 T.C. 697 (1965), affd. per curiam 351 F.2d 308 (1st Cir. 1965). The record herein contains no evidence whatsoever to show that the fair rental value of petitioners' personal use of the demonstrator automobile was less than $600 a year, as determined by the Commissioner.Although we find some merit in petitioners' contention, the issue of the deductibility of business use of petitioners' personal automobile was not raised in the pleadings and no motion was made to conform the pleading to the proof adduced at trial pursuant to Rule 41(b), Tax Court Rules of Practice and Procedure. Moreover, petitioners introduced no evidence other than oral testimony to substantiate their contention of offset or to indicate that such business use of their personal automobile was "ordinary and necessary" as required by section 162. Nor did they prove that the business use of their automobile was a condition of employment *60 by the corporation and not reimbursable by the corporation. C. D. Fountain,59 T.C. 696, 708 (1973). Accordingly, the determination of the Commissioner is sustained on this issue. Decisions will be entered under Rule 155. Footnotes
1. All Code section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted. ↩
2. SEC. 316. DIVIDEND DEFINED. (a) GENERAL RULE.--For purposes of this subtitle, the term "dividend" means any distribution of property made by a corporation to its shareholders-- (1) out of its earnings and poofits accumulated after February 28, 1913, or (2) out of its earnings and profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made. Except as otherwise provided in this subtitle, every distribution is made out of earnings and profits to the extent thereof, and from the most recently accumulated earnings and profits. To the extent that any distribution is, under any provision of this subchapter, treated as a distribution of property to which section 301 applies, such distribution shall be treated as a distribution of property for purposes of this subsection. (b) SPECIAL RULES.-- (1) Certain Insurance Company Dividends.--The definition in subsection (a) shall not apply to the term "dividend" as used in subchapter L in any case where the reference is to dividends of insurance companies paid to policyholders as such. (2) Distributions by Personal Holding Companies.-- (A) In the case of a corporation which-- (i) under the law applicable to the taxable year in which the distribution is made, is a personal holding company (as defined in section 542), or (ii) for the taxable year in respect of which the distribution is made under section 563(b) (relating to dividends paid after the close of the taxable year), or section 547(relating to deficiency dividends), or the corresponding provisions of prior law, is a personal holding company under the law applicable to such taxable year, the term "dividend" also means any distribution of property (whether or not a dividend as defined in subsection (a)) made by the corporation to its shareholders, to the extent of its undistributed personal holding company income (determined under section 545 without regard to distributions under this paragraph) for such year. (B) For purposes of subparagraph(A), the term"distribution of property" includes a distribution in complete liquidation occurring within 24 months after the adoption of a plan of liquidation, but-- (i) only to the extent of the amounts distributed to distributees other than corporate shareholders, and (ii) only to the extent that the corporation designates such amounts as a dividend distribution and duly notifies such distributees of such designation, under regulations prescribed by the Secretary or his delegate, but (iii) not in excess of the sum of such distributees' allocable share of the undistributed personal holding company income for such year, computed without regard to this subparagraph or section 562(b)↩.
3. Holsey v. Commissioner,258 F.2d 865 (3d Cir. 1958), revg. 28 T.C. 962 (1957), was acquiesced by the Commissioner in Rev. Rul. 58-614, 1958-2 C.B. 920. Moreover, the reversal was adopted and followed by this Court in Milton F. Priester,38 T.C. 316 (1962), a Court-reviewed opinion. It is also important to note that the court in Holsey↩ reached this result despite the taxpayer's concession that the option price was less than the market value of the redeemed shares.
4. Although it appears that the issuance of the additional shares of stock in 1972 might constitute a nontaxable stock dividend pursuant to section 305, and the Income Tax Regs. promulgated thereunder, we find it unnecessary to express an opinion on a transaction occurring in a taxable year not involved herein.↩
5. Petitioner makes no contention that the transfer of the automobile was made in partial satisfaction of a debt owed to Mr. Fagan; i.e., made by reason other than that of the corporation-shareholder relationship. ↩
6. SEC. 311. TAXABILITY OF CORPORATION ON DISTRIBUTION. (a) GENERAL RULE.--Except as provided in subsections (b), (c), and (d) of this section and section 453(d), no gain or loss shall be recognized to a corporation on the distribution, with respect to its stock, of-- (1) its stock (or rights to acquire its stock), or (2) property. ↩
7. Sec. 1.311-1 General. (a) Except as provided in subsections (b), (c), and (d) of section 311, section 453(d) (relating to installment obligations) and such other provisions of the Code as sections 341(f), 617(d), 1245(a), 1250(a), 1251(c), and 1252(a), no gain or loss is recognized to a corporation on the distribution, with respect to its stock, of stock, or rights to acquire its stock, or property (regardless of the fact that such property may have appreciated or depreciated in value since its acquisition by the corporation). However, the proceeds of the sale of property in form made by a shareholder receiving such property in kind from the corporation may be imputed to the corporation if, in substance the corporation made the sale. Moreover, where property is distributed by a corporation, which distribution is in effect an anticipatory assignment of income, such income may be taxable to the corporation. The term "distributions with respect to its stock" includes distributions made in redemption of stock (other than distributions in complete or partial liquidations).See, however, paragraph (e) of this section for distributions to which section 311↩ does not apply. For the rule respecting the taxation of a corporation making a distribution of property in partial or complete liquidation, see section 336. 8. Cf. Rev. Rul. 57-490, 1957-2 C.B. 231↩.
9. No contention has been made that the premium payments are subject to the limited exclusion provided by section 79(a).↩